# HOUSING AND REDEVELOPMENT AUTHORITY OF MINNEAPOLIS v. MINNEAPOLIS METROPOLITAN COMPANY.

104 N. W. (2d) 864.

August 5, 1960—No. 38,028.

2

*O. A. Brecke* and *J. Robert Nygren,* for relator.
*Palmer & Palmer,* for respondent.

MURPHY, JUSTICE.

This matter is before us on a writ of certiorari to review a condemnation proceeding begun by the Housing and Redevelopment Authority of the City of Minneapolis, hereinafter referred to as the Authority. The proceeding is to take a lot which is the site of a 12-story

office building known as the Metropolitan Building and owned by Minneapolis Metropolitan Company, hereinafter referred to as the company. The property in question has been included by the Authority in an urban redevelopment project known as "Gateway Center Urban Renewal Plan, Minn. R-2." The company has asserted objections to the taking on several grounds. Trial was had in the district court on the issues raised by the objections. The action of the Authority was sustained and the petition to condemn allowed.

The points raised by the company must be viewed against the factual background. Pursuant to the Municipal Housing and Redevelopment Act, Minn. St. 462.415, et seq., the Authority, by action of the City Council of Minneapolis, was granted the power to plan and carry out urban rehabilitation, renewal, and redevelopment projects in the city of Minneapolis. The plan herein was adopted by the Authority on November 20, 1958, after having been duly adopted by the City Planning Commission. Hearing was held by the city council and on January 30, 1959, the plan was approved by the council.[1]

The plan provides for the wholesale acquisition of all of the land within the entire Gateway Center area except for certain "omitted" parcels. It is detailed and comprehensive, providing for new rights-of-way and easements, new land uses, street adjustments, new utilities, together with directions as to landscaping, zoning uses, building area ratios, building requirements, parking facilities, and signs, all in conformity to the plan. The entire area consists, as we view the record, of about 20 square city blocks. Except for omitted parcels, the Authority by resolution found that it was necessary to acquire all of the land within the area.[2]

---

[1] As approved, the project was named the "Lower Loop Urban Renewal Plan, Minn. R-2." The name was later changed to "The Gateway Center Urban Renewal Plan, Minn. R-2."

[2] In the original plan the omitted parcels were the Nicollet Hotel, Garage, and Parking Lot; the First Hennepin State Bank; the Minnesotan Hotel; the St. James Hotel; the Union City Mission; and Powers' new and old Warehouses. Evidently a revised plan was submitted under which the Times Building was an omitted parcel. Excluded from the project area were the new Public Health Center, the Library site, the Federal Courts site, the

The Metropolitan Building was erected in 1890. It is a 12-story building of monumental character, constructed in the lower three floors and basement of New Hampshire granite and in the upper floors of Minnesota sandstone. It is of bearing wall construction, supported by steel beams and cast iron columns and masonry walls.[3] There is a large open court extending from the center of the first floor to the twelfth, surrounded by railed balconies. Offices are located around the four sides of these balconies. At one end of the court are six unenclosed, cage-type elevators. The floors of the building are of masonry and tile arch construction, except for the balcony floors which are of glass.

Sometime before the petition to condemn was filed, efforts were made to have the building omitted from the plan. The company protested the taking on several grounds, the principal of which were that (1) the building was not properly a "blighted" structure; (2) that it was structurally sound; and (3) that it was economically maintainable during the project period of 30 years. Several proceedings were held by the Authority to determine whether the building should perhaps be excluded. It called upon its consulting engineer for reports as to the feasibility of retaining the structure as part of the renewal plan. The company was given a full hearing on the objections which it raised. Some of the evidence presented to the Authority by the property owner during these proceedings tended to support its arguments.[4] However, the report submitted to the Authority by its consulting engineer contained evidence to substantiate the taking. He was of the view that after an expenditure of approximately $1,200,000, which would be necessary to rehabilitate the structure, it would still be incompatible with the plan designed for the renewal area. He recommended that the building be demolished.[5] The inspector of buildings

---

Western Union Building and Garage, and the Employment Security Building site.

[3] Floor members that extend from internal columns are supported at one end by the wall and at the other by the column.

[4] Certain persons interested in the historical significance appeared before the Authority. Their testimony tended to support the company's position also.

[5] He also pointed out that rehabilitation would impair any historical value the building might have.

of the city of Minneapolis also submitted a report to the Authority. He stated with reference to the exterior of the building:

"* * * It is my opinion that the action of time and the elements is disintegrating the exterior at a faster rate than the maintenance is arresting. If the required degree of maintenance were given the exterior, it would be so costly as to render the retention of the structure an economic failure."

As to the structure itself, he commented:

"* * * I also wish to point out that the structural makeup of the building is such as to be far below present day engineering standards and a similar design (structural) would not be permitted today for a 12 story building."

In the supporting documentation it is stated:

"* * * The obsolete exterior would stick out like a sore thumb in the redeveloped area. Because of the nature of the wall and the costs involved, the wall surface does not lend itself to visual improvement. There is no way economically to rehabilitate the building or to make it more presentable. Age and construction type combine to make this an undesirable building."

The Authority, having considered the evidence submitted by the company together with the reports of its consulting engineer and the inspector of buildings, reaffirmed its decision to take the building. In its Resolution 59-438, September 17, 1959, it stated:

"After careful study it appears that to bring the building up to the required Building and Fire Protection Standards and to modernize it to meet competitive rental conditions, would require an expenditure which could not be recaptured by rentals in the competitive market, and if that were the case the building would cease to maintain itself and sooner or later demolition would become necessary, in the interest of public safety and welfare and retention of the building would interfere with the redevelopment plan of The Authority * * *, would tend to deter investors or reduce the amounts which they would be willing to pay for adjacent property."

At the trial in district court, further testimony with reference to the condition of the building was received, together with numerous exhibits, including resolutions of the Authority and photographs of the structure. This evidence related to potential fire hazards, the practicability of rehabilitation, and economic considerations bearing upon the issue. Briefly summarized, it may be said that there was evidence to the effect that time and the elements had taken their toll and had so far deteriorated the stone on some of the upper floors that pieces had fallen away. The company presented evidence that this condition could be controlled by a sandblasting and a tuck-pointing job and with proper future maintenance. While large expenditures had been made by the company on the interior of the building, it was the view of the building inspector that:

"It would not be impossible to remodel the interior to effect a more economical use of space * * * but the cost of such an ambitious program would be contrary to good judgment and it would not be in the interests of the public inasmuch as the structural elements would not benefit and be removed from the substandard classification."

Considerable testimony was placed in the record concerning fire hazards presented by the building as presently constructed.

Much of the evidence relates to the nature of the building and its esthetic compatibility to the entire project area. The exhibits presented by the Authority present the picture of the structure as an architectural anachronism, and while the exhibits show that there is merit in the structure as a historical piece, nevertheless it seems clear that the building is indisputably out of date and would to some extent be out of place in the project area. However, it is clear that the record shows no evidence that the building is structurally unsound.

After hearing the evidence at length, the trial court in a helpful memorandum stated:

"The Court must confess that at first blush he might have felt that demolition of the Metropolitan Building, a landmark in lower Minneapolis for many years, to make way in this instance for use of the particular land area as a parking lot might have indicated at least an 'arbitrary' exercise of judgment on the part of the Authority. However,

the evidence indicates that this particular building is itself a 'blighted' building, is at present unsafe both on the exterior and interior for continued occupancy and use. It is further clear that the necessary repairs, if they could be made, to put the building in safe condition, would not place this building in such shape that it would be a proper part of the projected new development, and the expenditures to completely modernize it would apparently be economically unsound."

The company contends that the determination to take the property with its improvements is invalid (1) because the plan itself is contrary to both state and Federal law because it does not provide for renewal housing; (2) because it does not provide for relocation of persons displaced by the project; and (3) because the determination by the Authority to take the company's building is arbitrary, capricious, and unreasonable.

■ In Housing and Redevelopment Authority of City of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673, and Asch v. Housing and Redevelopment Authority of City of St. Paul, 256 Minn. 146, 97 N. W. (2d) 656, we discussed at some length the development of state and Federal statutes relating to housing, redevelopment, and urban renewal projects. Following Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. ed. 27, we held among other things that these acts are constitutional in that the acquisition and clearing of blighted areas serve a public purpose. We have not, however, considered the first point raised by the company as to whether the present Municipal Housing and Redevelopment Act permits a renewal plan which omits specific provision for replacement housing. The plan before us is unique in that, as we have already indicated, the proposed uses are limited to commercial and light industrial uses and incidental service facilities, including parking and utility easements. No provision is made for housing to take the place of housing which will be eliminated.

We agree with the trial court that the proposed plan represents a valid exercise of discretion placed in the Authority to determine the character of the redevelopment area. The district generally embraces the older part of the business district of Minneapolis which lies between the river and railroad trackage district on the north and the

newer business district which extends to the south and west. As commercial establishments have moved to newer locations over the years, the older district has become neglected and has deteriorated to the point where it largely consists of rundown properties used for bars, roominghouses, and establishments serving the needs and demands of transients and persons of marginal income. Because of the location and character of the area and its adaptability to commercial and light industrial purposes, it is understandable that the Authority made no provision for renewal housing within the area. We find nothing, either from an examination of the statutes or the authorities which discuss the subject of renewal uses, that a redevelopment plan must necessarily provide for housing. We think that this conclusion is supported by an examination of the various statutes.[6] It is further apparent

---

[6]Minn. St. 462.415. "Subd. 2. It is found that the public interest requires the clearance, replanning, reconstruction, and neighborhood rehabilitation of such substandard and unsanitary areas, *and* the provision of decent, safe, and sanitary housing for persons of low income and their families; that such redevelopment *and* the provision of such housing for persons of low income and their families are essential to protect the sources of public revenues; that, in order to protect the financial stability of communities, it is necessary to redevelop substandard and blighted areas according to a comprehensive community plan for development *and* by encouraging the production of housing properly planned and related to public facilities; that these conditions cannot be remedied by the ordinary operations of private enterprise or by regulation alone; that provision must be made to encourage private enterprise to engage in redevelopment *or* to provide housing facilities in substandard areas, to be constructed in accordance with such comprehensive plan; * * * that local public bodies must be created and authorized to undertake redevelopment *and* to provide decent, safe, and sanitary low-rent housing for persons of low income and their families where a supply of low-rent housing for families of low income *and* adequate redevelopment of substandard areas cannot be accomplished at a cost which would warrant private initiative to provide such housing or to undertake such redevelopment, * * *.

"Subd. 3. It is hereby declared to be the policy to protect and promote the welfare of the citizens of this state by employing all means necessary and appropriate to satisfy the foregoing needs; that the cooperation of the state and its subdivisions is necessary to accomplish such purposes; that (1) the clearance, replanning, and reconstruction, rehabilitation, and mod-

from Minn. St. 462.421, subd. 13(5), that an urban renewal project is not limited to housing renewal purposes. That section provides in part:

"The term 'redevelopment' and the term 'redevelopment project' shall also include 'urban renewal' and 'urban renewal project'. The term 'urban renewal project' may include undertakings and activities for the elimination (and for the prevention of the development or spread)

---

ernization of substandard areas *and* the provision of decent, safe, and sanitary housing for persons of low income and their families by local public bodies and (2) the participation in such redevelopment projects *and* the provision of adequate housing properly planned and related to public facilities in such substandard areas, according to a redevelopment plan as herein provided, by private enterprise, with or without partial tax exemptions, are public uses and purposes for which private property may be acquired and public money may be spent; that these conditions require the creation of the authorities, instrumentalities, and corporations hereafter prescribed to expedite the provision of adequate housing *and* for the purpose of attaining the ends herein recited, and the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination." (Italics supplied.)

§ 462.421. "Subd. 11. 'Blighted area' means any area, including slum areas, with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light, and sanitary facilities, excessive land coverage or deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.

\* \* \* \* \*

"Subd. 13. 'Redevelopment project' shall mean any work or undertaking: (1) To acquire blighted areas and other real property for the purpose of removing, preventing, or reducing blight, blighting factors, or the causes of blight; \* \* \*.

\* \* \* \* \*

"Subd. 15. 'Redevelopment plan' means a plan approved by the governing body (or agency designated by it for that purpose or authorized by law so to act) of each municipality in which any of the area to be covered by a redevelopment project is situated, which plan provides an outline for the development or redevelopment of such area and is sufficiently complete (1) to indicate its relationship to definite local objectives as to appropriate land uses; and (2) to indicate general land uses and general standards of development or redevelopment."

of slums *or* blighted, deteriorated, or deteriorating areas and may involve any work or undertaking for such purpose constituting a redevelopment project or any rehabilitation or conservation work, or any combination of such undertaking or work." (Italics supplied.)

It is further clear from § 462.421, subd. 14, that the legislature contemplates that an authority may distinguish between a housing project or a redevelopment project. That section provides:

" 'Project' means a housing project *or* a redevelopment project, or both. The term 'project' also may be applied to all real and personal property, assets, cash, or other funds, held or used in connection with the development or operation of the housing project or redevelopment project, as the case may be." (Italics supplied.)

Moreover, it should be noted that by L. 1957, c. 810, § 1, the legislature amended § 462.415, subd. 1, which relates to the purpose, public interest, and declaration of policy as to the Municipal Housing and Redevelopment Act, so as to give it application to—

"* * * *buildings and structures used or intended to be used for living, commercial, industrial or other purposes or any combination of such uses* which, by reason of sociological and technological changes, dilapidation, obsolescence, overcrowding, and faulty arrangement or design of building and improvements, lack of public facilities, ventilation, light and sanitary facilities, excessive land coverage, or deleterious land use, or obsolete layout, or any combination of these and other factors, are injurious to the health, safety, morals and welfare of the citizens of this state, cause an increase and spread of crime, juvenile delinquency, and disease, inflict blight upon the economic value of large areas, and, by impairing the value of private investments, threaten the source of public revenues while decentralizing communities to areas improperly planned and not related to public facilities, and require many persons of low income to occupy unsafe, unsanitary, and overcrowded dwellings." (Italics indicate amendment.)

We find nothing from an examination of the statutes which indicates that it is obligatory for a redevelopment authority to limit land uses to low-rent housing or to projects which integrate housing with other uses. We agree with the trial court's conclusion that:

"* * * the Minnesota Act allows 'redevelopment' or 'housing' separately under any proposed plan, or both may be included in the same plan. Our law definitely contemplates that there may be plans which provide for clearance of slum or blighted areas with no provision whatsoever for replacement housing in the plan, * * *."

■ It is the further contention of the Metropolitan Company that the Authority exceeded its power in proceeding with the plan and condemnation of its property without adequate provision for temporary or permanent relocation of displaced persons.[7] It argues that the failure of the plan to provide specific housing for displaced persons living in the project area renders the plan illegal and deprives the court of jurisdiction to order condemnation in this proceeding. The company relies on § 462.531 and its counterpart in the Federal act, 42 USCA, § 1455. The former provides:

"Prior to approval by the authority of any redevelopment plan, it shall be satisfied that there is a feasible method for the temporary relocation of families to be displaced from the project area, and that there are available or will be provided, in the project area or in other areas not less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families displaced from the project area, decent, safe, and sanitary dwellings equal in number to the number of such displaced families."

While there are many residents in the proposed project area,[8] no express provision was made in the plan for their relocation. The Authority caused an investigation to be made into the relocation problem. It was found that 1,250 new housing units were required to solve the relocation problem. The Authority provided a relocation office which

---

[7]There is authority for the view expressed in Judge Loevinger's concurring opinion that the company is without standing to raise this objection. The point was briefed and argued by the parties, however, and we decide it now rather than risk further delay in the proceedings by having the question passed upon in another case.

[8]The record shows that a total of 3,334 persons actually resided in the project area at the time of a study made before the plan was adopted.

performed the functions of finding available, suitable housing for displaced families. The plan with respect to the responsibility of the Authority under the statute provides:

"The Authority accepts its responsibility as set forth in State and Federal Law for relocation of displaced families. The Authority further assumes the responsibility of relocating single persons now living within the project area."

In addition the plan outlines the characteristics of the population, lists the residential resources available, and proposes certain "solutions." Concern was expressed for those residents of the area with "special problems of social maladjustment, low income, alcoholism and illness," which made them undesirable and unacceptable as tenants. Provision was made for a "Relocation Advisory Council" to advise and assist on the matter. The resolution of the city council approving the plan provided in part:

"That it is hereby found and determined that the proposals set forth in the Relocation Plan for the proper relocation of the families displaced in carrying out the project in decent, safe, and sanitary dwellings in conformity with acceptable standards *are feasible* and can be reasonably and timely effected to permit the proper prosecution and completion of the project; and that such dwellings available or to be made available to such displaced families are at least equal in number to the number of displaced families, are not generally less desirable in regard to public utilities and public and commercial facilities than the dwellings of the displaced families in the project area, are available at rents or prices within the financial means of the displaced families and

---

These included:

| | |
|---|---|
| "The Elderly and Handicapped | 1,333 |
| Casually Employed and Temporarily Unemployed | 1,214 |
| Transients | 150 |
| Regularly Employed | 300 |
| Single Women | 167 |
| The Married persons | 170 |
| | 3,334" |

are reasonably accessible to their places of employment and that (1) the land in the project area would not be made available for redevelopment without the financial aid to be sought; (2) the redevelopment plans for the redevelopment areas in the locality will afford maximum opportunity, consistent with the sound needs of the locality as a whole for the redevelopment of such areas by private enterprise; and (3) that the redevelopment plan conforms to the general plan for the development of the locality as a whole." (Italics supplied.)

It may be conceded that the relocation of these displaced residents was a responsibility of the Authority and that, so far as practicable, that responsibility had to be provided for in the plan. We take as true all of the statements made in both the plan and in the resolution of the city council, 58-355. While both the Federal and state acts do require some indication of the solution of the problem of where to place the residents of such projects, neither act contemplates any more than the action taken in this plan. Since the Federal Housing Administration has already advanced to the Minneapolis Authority loans and grants in excess of 10 million dollars, we may assume that the standards of compliance established under Federal procedures have been met. The evident purpose of § 462.531 is to require the Authority to make some effort toward relocation of the displaced residents in suitable housing; it does not bind the Authority to find and place every individual in shelter before the plan takes effect. Since the Authority has determined on the basis of the survey it has made that the community can accommodate displaced persons in other locations and has provided facilities for information as to where such new locations may be found, it has done all that is necessary under the act.

■ It is next contended by the company that the determination to include its property in the plan was an arbitrary, unreasonable, and capricious exercise of authority. It asserts that the building is not "blighted," that it is structurally sound, may be operated economically, and does not offend against the uses provided by the project plan. It concludes that the taking therefore serves no public purpose.

Both parties agree to the oft-stated proposition that once the condemnation purpose is found to be public the only question which the

courts may entertain is that of adequate and just compensation for the parcel taken.[9] The parties differ in their interpretation of our statement in the Greenman case, followed in the Asch case, to the effect that (255 Minn. 403, 96 N. W. [2d] 679):

"It is within the province of the legislature to declare a public use or purpose, subject of course to a review by the courts, and such determination by the legislative body will not be overruled by the court except in instances where that determination is manifestly arbitrary or unreasonable."

The Authority maintains that once a public purpose is found in the redevelopment of the project area a court is without authority to review its determination with reference to the taking of particular property within the area. This view is supported by the statement in Berman v. Parker, 348 U. S. 26, 35, 75 S. Ct. 98, 104, 99 L. ed. 27, 39, to the effect that:

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."

While it may be conceded that courts have generally disclaimed the power of supervising the selection of a site for public improvements, nevertheless they are reluctant to surrender their right to prevent an abuse of the discretion delegated by the legislature by an attempted appropriation of land in utter disregard of the public necessity of its use. If property is taken for a use that is not public, the owner's constitutional rights are infringed. It is presumed that property taken under the power of eminent domain is taken for the purpose stated in the condemnation proceeding. That presumption is not conclusive, however, and courts will interfere for the protection of the property owner where it appears that under the guise of taking the property for a

---

[9] 6 Dunnell, Dig. (3 ed.) § 3027; Housing and Redevelopment Authority of City of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673.

proper use it is in fact being taken for an improper use, or, as we held in State ex rel. Ford Motor Co. v. District Court, 133 Minn. 221, 158 N. W. 240, the conditions for the exercise of the power are not present. Great weight must be given to the determination of the condemning authority, and the scope of review is narrowly limited. If it appears that the record contains some evidence, however informal, that the taking serves a public purpose, there is nothing left for the courts to pass upon. Courts may interfere only when the Authority's actions are manifestly arbitrary or unreasonable. The acts of an authority vested with legislative determination in a particular area are manifestly arbitrary or unreasonable where they are taken capriciously, irrationally, and without basis in law or under conditions which do not authorize or permit the exercise of the asserted power.[10] The court is precluded from substituting its own judgment for that of the Authority as to what may be necessary and proper to carry out the purpose of the plan. We do not understand that it is the function of the court to decide between conflicting opinions of the parties as to the advisability of a discretionary act. The question before us is one of the power of the Authority to exercise its judgment in making a determination where the power so to do has been conferred by statute. As applied to the facts before us we think the following rule is sound:

"In determining whether a particular area may legally be selected for redevelopment, either under the terms of the statute, or in terms of the requirement that the particular project serve a 'public use,' the role of judicial review is severely limited by the rule that the finding of the redevelopment authority, or similar administrative agency, that a particular area is 'blighted,' that redevelopment serves a 'public use,' or the like, is not generally reviewable, unless fraudulent or

---

[10]Kaskel v. Impellitteri, 306 N. Y. 73, 115 N. E. (2d) 659; Webb v. Dameron (Tex. Civ. App.) 219 S. W. (2d) 581; In re St. Paul & Tacoma Lbr. Co. 7 Wash. (2d) 580, 110 P. (2d) 877; Texas Liquor Control Board v. Floyd (Tex. Civ. App.) 117 S. W. (2d) 530; Eureka Bldg. & Loan Assn. v. Myers, 147 Kan. 609, 78 P. (2d) 68; In re Housing Authority of City of Salisbury, 235 N. C. 463, 70 S. E. (2d) 500.

capricious, or, in some instances, unless the evidence against the finding is overwhelming."[11]

We find no evidence in the record which would support the company's contention that the taking of the Metropolitan Building is arbitrary, unreasonable, or capricious, or that the evidence against the necessity or public use is overwhelming. On the contrary we must concede that the determination of the Authority is supported by evidence of the obsolescence of the building and the opinion evidence that if it remains in the area it will have an unfavorable effect upon the value of surrounding property and consequently lessen the amount of tax the redeveloped area will produce.[12]

■ As to the contention of the company that the building should not be taken because it is a sound building, we can only refer to Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. ed. 27, where the same contention was made by the property owner and where it was held that the Authority is permitted to attack the problem of blighted parts of a community on an area rather than on a structure-by-structure basis. There, as here, the particular use to be made of the land in the project area was determined with regard to the particular needs of the community. Those charged with making the determination decided that if the area was to be restored to a use which would be productive to the community as a whole the entire area needed redesigning. Even though the building be sound and capable of being economically operated, we must defer to the judgment of the commission that the interests of the public will be better served by the condemnation. It is not for this court to say that the property owner is right and the Authority is wrong in its opinion that by permitting the structure to remain in the area surrounding property values will be reduced and tax revenues lessened.

Affirmed.

---

[11]Annotation, 44 A. L. R. (2d) 1437.

[12]The following is from the minutes of the regular meeting of the Authority held June 18, 1953:

"It was reported that the block the Nicollet Hotel is situated on, paid $91,000 taxes for the year 1952, and the block bounded by Washington, Second Street, Hennepin Ave. and Marquette, paid $17,000."

LOEVINGER, JUSTICE (concurring specially).

I concur in the disposition of this case by the court but dissent from the court's opinion with respect to the second point.

Relator contends that the Authority has not complied with the statutory mandate to find or provide "a feasible method for the temporary relocation of families to be displaced from the project area." Minn. St. 462.531. From an examination of the record I am not convinced that the Authority has complied with this mandate. The record may be incomplete on this point, but we take it as it comes to us. It does not establish that the Authority in this respect has done "all that is necessary under the act."

However, the Metropolitan Building provides no housing and its destruction will involve no loss of housing. Relator has shown no interest, distinguishable from that of any member of the public, in the provision of housing for those displaced from this area. Consequently it has no standing to raise this issue. In re Settlement of Cegon, 212 Minn. 75, 2 N. W. (2d) 433; Schultz v. Krosch, 204 Minn. 585, 284 N. W. 782; Sackette v. City of Duluth, 201 Minn. 121, 275 N. W. 617; C. Thomas Stores Sales System, Inc. v. Spaeth, 209 Minn. 504, 297 N. W. 9. Accordingly, I deem it inappropriate that the court should pass upon this issue and believe that the action of the district court should be affirmed without the comments relating to this point that appear in the court's opinion.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.