# HOUSING AND REDEVELOPMENT AUTHORITY
## OF CITY OF ST. PAUL v. COLEMAN'S SERVICE, INC.

160 N. W. (2d) 266.

July 19, 1968—No. 41,210.

*Kenneth E. Tilsen,* for relator.

*A. Patrick Leighton, William M. Beadie, James T. Hart,* and *Moore, Costello & Hart,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review a decision and order of the District Court of Ramsey County. The order being reviewed would authorize the taking by eminent domain of property in downtown St. Paul on the petition of the St. Paul Housing and Redevelopment Authority (herein referred to as the Authority), a corporation organized pursuant to the Municipal Housing and Redevelopment Act, L. 1947, c. 487, as amended (Minn. St. 462.411 to 462.711).

Relator, Coleman's Service, Inc., a corporation (herein referred to as Coleman's), is the owner of property at the northwest corner of Robert Street and Kellogg Boulevard. It maintains a street-level parking lot on these premises. The block in which its property is located is bounded by Fourth Street and Kellogg Boulevard on the north and south and by Robert Street and Minnesota Street on the east and west.

In 1964, the Authority, after finding that the area in question was a blighted area which could not be redeveloped without government assistance, designated a large area of downtown St. Paul, including Block 25, the block in which relator's property is located, as an urban renewal project. The St. Paul City Council adopted the Authority's findings and approved the project.

The Authority then filed a petition in condemnation against certain owners of property in Block 25, including Coleman's. The proceedings with respect to the other owners named in the petition do not here concern us. On March 24, 1966, Coleman's served its answer and objections to the petition.

The trial was commenced before a judge of the Ramsey County District Court on June 16, 1967, without a jury. At the conclusion of the trial, oral arguments were held and thereafter briefs were submitted by the parties. After considering the evidence, briefs, and arguments of counsel, the court upheld the findings that the project area, including Block 25, was blighted and that the project could not be carried out without government assistance. It concluded that the taking was for a public use; that the purpose of the Authority and the city council was in accordance with law; that none of the findings or proceedings of the Authority or city council was unreasonable, arbitrary, or capricious; that all findings and conclusions were sustained by the evidence; and that the petition should be granted.

In a memorandum accompanying the findings and conclusions, the trial judge said that, while there was no serious claim that the redevelopment area was a slum, he had no difficulty in determining that the evidence sustained the determination of the Authority that it was blighted. Hence, he said, the case squarely presented the question of whether redevelopment of a nonslum area which is blighted is a public purpose which would justify condemnation of the property involved. Although he noted that the modern trend of authority is to the effect that redevelopment of blighted areas is a public purpose which justifies resort to the power of eminent domain, he stated that the question was important and doubtful and certified it as such. As discussion of the decisions referred to in this opinion will indicate, we do not believe that the question certified as doubtful is in fact doubtful. Furthermore, Coleman's has not advanced the question as an issue on appeal. Therefore, we deem it unnecessary to discuss the question further.

Coleman's argues on review that the Authority must find, not only that the area to be taken is blighted, but that the blight is detrimental to the public health, safety, morals, or welfare; that in any event there is no

evidence to support the finding of blight; that there is no evidence that government assistance is necessary to renovate the area; and that the taking is unconstitutional because it does not serve a public use.

■ We find no merit in Coleman's contention that the Authority is required to make a specific finding that existing conditions on property to be acquired are inimical to the public health, safety, morals, or welfare. Certainly there is nothing in the statute which requires such a finding. Minn. St. 462.421, subd. 13, defines a "redevelopment project" as the acquisition and redevelopment of a blighted area. Section 462.421, subd. 11, contains the definition of "blighted area":

" 'Blighted area' means any area, including slum areas, with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light, and sanitary facilities, excessive land coverage or deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community."

It therefore appears that "blighted area" is defined as an area detrimental to public health, safety, morals, or welfare. Thus, a finding that an area is blighted is in effect a finding that it is detrimental to health, safety, morals, or welfare, and this latter finding would be superfluous.

The foregoing discussion likewise provides the reply to the argument that the Constitution requires a specific finding that the area proposed to be taken is detrimental to public health, safety, morals, or welfare. In the field of urban renewal, Coleman's contends, the power of eminent domain cannot be exercised unless the property to be taken is in some respect detrimental to health, safety, morals, or welfare, and thus a finding to that effect must precede the exercise of the power. Assuming that this argument has validity, it has no application here for, as discussed, the finding of blight is equivalent to the finding which Coleman's says is constitutionally required. And whatever authority this court may exercise to assure that constitutional rights are not infringed can as effectively be exercised when the relevant finding is blight as when it is impairment of public health, safety, morals, or welfare. Nothing turns on the form of words chosen.

We come then to the question of whether the finding of the Authority

that the area involved is a "blighted area" within the meaning of § 462.421, subd. 11, was arbitrary, capricious, or unreasonable. The trial court determined that it was not.

We think our opinion in Housing and Redevelopment Authority v. Minneapolis Metropolitan Co. 259 Minn. 1, 104 N. W. (2d) 864, in which we expressed a general reluctance to interfere with the exercise of the eminent domain power and a particular reluctance to upset findings of fact by the condemning authority, controls our disposition of this question. In that case, pursuant to the Municipal Housing and Redevelopment Act (Minn. St. 462.411, et seq.), the Minneapolis Housing and Redevelopment Authority by action of the city council was granted the power to plan and carry out urban redevelopment, renewal, and redevelopment projects in the city. The plan in question was adopted by the Authority in November 1958, after having been duly adopted by the City Planning Commission of Minneapolis, and it was approved by the council. The plan provided for the wholesale acquisition of all the land within the entire Gateway Center area of Minneapolis except certain omitted parcels. The entire area consisted of about 200 square city blocks. The authority found it was necessary to acquire all the land within the area, including the site of the Metropolitan Building, a 12-story structure of monumental character erected in 1890. The company which owned the building protested the taking on the grounds that the building was not a "blighted" structure, was structurally sound, and was economically maintainable during the project period of 30 years.

The authority, after considering the evidence submitted by the company, reaffirmed its decision to take the building, and its action was upheld in the district court. On appeal the company contended that the determination to take the property was invalid (1) because the plan itself was contrary to both state and Federal law, as it did not provide for renewal housing; (2) because it did not provide for relocation of persons displaced by the project; and (3) because the determination by the authority to take the company's building was arbitrary, capricious, and unreasonable.

We affirmed in that case. Following Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. ed. 27, we pointed out that Federal and state statutes relating to housing, redevelopment, and urban renewal projects are con-

stitutional in that the acquisition and clearing of blighted areas serve a public purpose. We stated there that, while it may be conceded that the courts generally disclaim power of supervision over the selection of a site for public improvements, they are reluctant to surrender their power to determine whether property is taken for a public use. However, noting the presumption that property taken under the power of eminent domain is taken for the purposes stated in the condemnation proceedings, we said that great weight must be given to the determination of the condemning authority and that the scope of review is narrowly limited. If it appears that the record contains some evidence, however informal, that the taking serves a public purpose, there is nothing left for the courts to pass on. A court may interfere only when the authority's actions are manifestly arbitrary or unreasonable and is precluded from substituting its own judgment for that of the authority as to what may be necessary and proper to carry out the purpose of the plan. Summing up the scope of review, we said (259 Minn. 15, 104 N. W. [2d] 874):

"In determining whether a particular area may legally be selected for redevelopment, either under the terms of the statute, or in terms of the requirement that the particular project serve a 'public use,' the role of judicial review is severely limited by the rule that the finding of the redevelopment authority, or similar administrative agency, that a particular area is 'blighted,' that redevelopment serves a 'public use,' or the like, is not generally reviewable, unless fraudulent or capricious, or, in some instances, unless the evidence against the finding is overwhelming."

When measured by the above test, there is abundant evidence to support the finding that the area in question is "blighted." The record discloses that over half of the buildings in the area are substandard physically; that many of the buildings are vacant in whole or in part; that many structures are landlocked and thus pose a threat to safety in the event of fire; and that the manner in which many of the structures were constructed renders them functionally obsolete. About 60 percent of Block 25 is unimproved land, and many of the structures on the balance are obsolete. Roughly 20 percent of the ground-floor space in the project area is devoted to street-level

parking facilities such as Coleman's, and these represent a highly inefficient use of downtown real estate.

We thus think that there is substantial evidence on the record upon which the Authority could decide that the area involved in this project was a "blighted area" within the meaning of the statute; and that it was therefore not manifestly arbitrary, capricious, or unreasonable for it to so decide. The trial court's determinations to this effect must therefore be affirmed.

■ We next consider whether the determination by the Authority that the project could not be carried out without government assistance was manifestly arbitrary, capricious, and unreasonable.

Coleman's initial contention in this respect is that the Authority and the trial court failed to make the finding required by the statute. Minn. St. 462.425 creates a housing authority in each municipality but provides that such authority shall not transact any business until the municipality's governing body finds that at least one of several specified conditions, including "substandard, slum, or blighted areas * * * which cannot be redeveloped without government assistance," exists. Section 462.445, subd. 1(6), provides that a housing and redevelopment authority can acquire property by the exercise of the eminent domain power if it adopts a resolution "that the acquisition of the real property is necessary to eliminate one or more of the conditions found to exist in the resolution adopted pursuant to section 462.425." Reading these two sections conjunctively, Coleman's argues that § 462.445, subd. 1(6), allows a blighted area to be taken by condemnation only if the Authority finds that the area "cannot be redeveloped without government assistance." In fact, it concludes, no such finding was made, for the Authority found only that the redevelopment project could not be carried out without government assistance, not that the area could not be redeveloped in some manner without such assistance. In other words, it argues that the Authority found only that this particular project required the helping hand of government, not that private development of Block 25 was infeasible.

To properly appraise the merits of this argument, it is necessary to set forth so much of § 462.421, subd. 13, defining "redevelopment project," as is material here:

" 'Redevelopment project' shall mean any work or undertaking: (1) To acquire blighted areas and other real property for the purpose of removing, preventing, or reducing blight, blighting factors, or the causes of blight; (2) To acquire open or undeveloped land which is determined to be blighted by virtue of conditions of unusual and difficult physical characteristics of the ground; or the existence of faulty planning characterized by the subdivision or sale of lots laid out in disregard of the contours or of irregular form and shape or of inadequate size; or a combination of these or other conditions *which have prevented normal development of the land by private enterprise* and have resulted in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety and welfare, provided that a redevelopment plan has been adopted which provides for the elimination of these conditions thereby making the land useful and valuable for contributing to the public health, safety and welfare and provided that the acquisition of the land is necessary to carry out the redevelopment plan." (Italics supplied.)

It will be seen from this subdivision that "redevelopment project" is defined as the acquisition of land subject to conditions which have prevented its private development. The inquiry made relevant in the definition is whether the area is generally amenable to private development, not whether the particular project envisaged can be accomplished without government aid. Accordingly, the finding by the Authority that the redevelopment project cannot be carried out without government assistance necessarily reflects a finding that conditions in the area discourage private development in general. Coleman's argument in this instance is, therefore, not convincing.

Coleman's alternative argument is that, even assuming that the finding that the redevelopment project could not be carried out without government assistance complies with the statutory requirement, it is not supported by the evidence. It claims that the facts overwhelmingly indicated that the block in question was on the verge of private development and that it would, as a matter of law, be impossible for any governmental body or court to determine that the property could not be developed without government assistance. It is our opinion that neither of these statements

can be supported by the applicable legal decisions or the evidence before the trial court.

The Authority's determination that the area cannot be redeveloped without government assistance, like its determination that the area is blighted, is subject to a narrowly limited scope of review by this court. As previously noted, we said in Housing and Redevelopment Authority v. Minneapolis Metropolitan Co. *supra,* that if the record contains some evidence to support a finding by an authority there is nothing left for the court to pass upon, as courts may interfere only when the authority's actions are manifestly arbitrary or unreasonable. As stated in that case, we are precluded from substituting our judgment for that of the Authority as to what may be necessary and proper to carry out the purpose of the plan. Here, there is evidence that multiple ownership and the high cost of purchasing and demolishing a multitude of obsolete structures has discouraged private development. There has been no significant private development of Block 25 for nearly 40 years. In view of this evidence we cannot say that the Authority's determination that the area involved here cannot be redeveloped without government assistance is arbitrary or unreasonable.

■    With respect to what appears to be Coleman's basic claim, that the case involves the legality of the plan to take property from one owner and sell it to another, suffice it to say that we have previously sustained such a practice.

As discussed above, we said in the Metropolitan Company case that it was within the province of the legislature to declare a public use or purpose, subject to review by the courts but to be overruled only when the determination was manifestly arbitrary or unreasonable. We expressed a similar opinion in Housing and Redevelopment Authority v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673. And in Asch v. Housing and Redevelopment Authority, 256 Minn. 146, 97 N. W. (2d) 656, we held that the determination of an authority to resell land, after it had been redeveloped, to a private business concern was the exercise of a legislative function delegated to the authority and that from the record we could not conclude that such determination was manifestly arbitrary or unreasonable.

In Greenman, we stated the rationale for sustaining a determination

that a taking was for a public use despite resale of the property involved to private interests (255 Minn. 405, 96 N. W. [2d] 680):

"There are many authorities holding that various so-called redevelopment statutes which provide for the exercise of the power of eminent domain, the expenditure of public funds, and the lending of public credit are valid despite provisions for the transfer of lands thus acquired by public authority to private parties. The underlying reason for these decisions is that the acquisition and clearing of blighted areas completely serves a public purpose. The subsequent transfer of these lands to private parties is incidental to the main public purpose."

Later in the opinion, we elaborated on this reasoning (255 Minn. 406, 96 N. W. [2d] 681):

"* * * The purpose of the act is not only to remove slums and blighted areas but also to prevent the redevelopment areas from reverting to their former status. * * * *If the public use which justifies the exercise of eminent domain in the first instance is the use of the property for purposes other than slums, that same public use continues after the property is transferred to private persons. The public purposes for which the land was taken are still being accomplished.*"

Then, as if in anticipation of Coleman's contention that a sale for luxury apartment use, as opposed to other possible uses, is not a public use, we went on to say (255 Minn. 407, 96 N. W. [2d] 681):

"* * * The fact that the act does not thereafter insure a continued use for public purpose does not in any way affect the purpose of the act or render the taking of the property a taking for a use or purpose which is not public. *'The achievement of the redevelopment of slum and blight areas, as defined in the act, * * * constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved.'*" (Italics supplied.)

It is our opinion that the evidence contained in the record together with the existing and applicable legal authorities establishes that the taking of the blighted property here involved is for a public purpose and that sub-

sequent transfer of the property to private parties for use as a site for an apartment building is incidental to the public purpose.

It is always possible that proceedings of the type involved here may be subject to attack or criticism because of their complicated nature, especially when we consider the length of time over which they were conducted, the number of governmental bodies concerned, and the differences of opinion always present where policies are formulated.. However, those issues raised by the parties involved which merit discussion are disposed of by the foregoing consideration. Our review on certiorari of proceedings such as the one before us extends primarily to determining whether the findings and conclusions of the trial court are supported by sufficient competent evidence. We believe they are. Our function as an appellate court does not require us to discuss all of the evidence for the purpose of proving or demonstrating that it supports the trial court's findings. Our duty is performed when we have considered all of the evidence and from it have determined that it is reasonably sufficient. Meiners v. Kennedy, 221 Minn. 6, 20 N. W. (2d) 539. That is the situation here.

Affirmed.

Mr. Justice Otis took no part in the consideration or decision of this case.