EAGAN ECONOMIC DEVELOPMENT
AUTHORITY, Respondent,

v.

U–HAUL COMPANY OF MINNESOTA
a/k/a U–Haul Co. of Minnesota, et
al., Appellants,

Randall J. Quam, et al., Appellants,

Larson Training Services, Inc. d/b/a
Larson's Automotive Repair
Services, Appellants,

v.

Minnesota's Credit Union, et
al., Respondents Below,

Irma L. Parranto, et al., Respondents,

Jamal D. Ansari, et al., Respondents
Below.

No. A08–0767.

Court of Appeals of Minnesota.

May 19, 2009.

Robert B. Bauer, Jessica L. Sanborn, Severson, Sheldon, Dougherty & Molenda, P.A., Apple Valley, MN, for respondent Eagan Economic Development Authority.

Patrick J. Kelly, Kelly and Lemmons, St. Paul, MN, for respondent Stratford Holding, LLC and American Accounts & Advisers, Inc.

Daniel L. Scott, Anthony J. Novak, Paula Duggan Vraa, Larson King, LLP, St. Paul, MN, for appellants U–Haul Co. of Minnesota and Amerco Real Estate Company.

Steven J. Quam, Fredrikson & Byron, P.A., Minneapolis, MN, for appellants Randall J. Quam and Sandra K. Quam.

Gary G. Fuchs, Elizabeth E. Rein, Gary G. Fuchs, Attorney at Law, P.A., Eagan, MN, for appellant Larson Training Services, Inc.

Considered and decided by ROSS, Presiding Judge; TOUSSAINT, Chief Judge, and JOHNSON, Judge.

## OPINION

ROSS, Judge.

This appeal concerns the condemnation of three commercial properties by the Eagan Economic Development Authority (EDA) in the City of Eagan's Cedar Grove Redevelopment District.[1] The contesting property owners, Larson Automotive Repair Services, Competition Engines, Incorporated, and U–Haul Company of Minnesota, argue that the district court erred by granting the EDA's quick-take condemnation petition. Specifically, the property owners contend that the taking was not authorized by law; that the taking was not supported by findings of public purpose or necessity; and that the EDA's use of the

---

1. The EDA condemned 31 parcels in the initial action, but only six of the property owners initially objected and three have appealed to this court.

statutory "quick-take" procedure was improper. Because we conclude that the EDA exceeded the scope of its delegated condemnation authority, we reverse the district court's order granting the EDA's condemnation petition.

## FACTS

The property owners' parcels sit southeast of the intersection of Cedar Avenue and Highway 13 within the "Cedar Grove Redevelopment Area" that Eagan and the EDA established in 2001. Cedar Grove was targeted for redevelopment because the city and the EDA found that the area fell short of its economic potential and concluded that "redevelopment would not occur solely through private investment within the reasonably foreseeable future." An independent review determined that "parcels consisting of 70% of the area of the district are occupied by buildings, streets, utilities, paved or gravel parking lots ... and more than 50% of the buildings ... are ... substandard."

In October 2001, the city enacted Resolution 01–63, which established Cedar Grove as a tax increment financing district as defined by Minnesota Statutes section 469.174, subdivision 10(a)(1). In the same resolution, the city adopted a redevelopment plan for the district. The city expressly incorporated the redevelopment and TIF plans into its resolution, and it explicitly "approved, ratified, established, and adopted" the plans and resolved that the city together with the EDA would implement them.

From 2002 to mid–2007, the EDA and the city negotiated for and purchased approximately 80% of the targeted properties in the core area of the redevelopment district. But by September 2007, negotiations to purchase the remaining properties in the district stalled. The stall was at a critical time, because TIF fund eligibility was set to expire on July 22, 2008, and the city's plan to purchase the properties for redevelopment depended on the city being reimbursed for the purchases with TIF funds. The EDA resolved that, if necessary, it would use the power of eminent domain to acquire the remaining properties.

The EDA sought to exercise its purported authority to take the properties by eminent domain based on five findings. It found that (1) the redevelopment district is "blighted," as defined by the Minnesota Statutes; (2) redevelopment of the district will lead to substantial economic redevelopment; (3) the current deficiencies in Cedar Grove render the area detrimental to the safety and welfare of Eagan's residents; (4) redevelopment would help eliminate blight, modernize outdated buildings and incompatible uses, increase the tax base and employment and further the city's objective to create an economically viable area; and (5) it needed to acquire the properties by July 2008 for the city to be eligible for TIF reimbursement to cover the purchase cost. The EDA also found that condemnation was necessary, and it sought approval for quick-take condemnation in the district court.

Many of the property owners in the redevelopment district did not object to the condemnation, and the district court granted the EDA's quick-take condemnation petition as to those properties. But some owners objected. The district court scheduled an evidentiary hearing to determine, among other things, if taking the objecting owners' properties was necessary and supported by a public purpose, and whether the use of quick-take was justified.

The district court issued a post-hearing supplemental order granting the EDA's quick-take condemnation petition, concluding that (1) the EDA's actions would fur-

ther a public purpose; (2) the EDA's proposed taking is necessary to redevelop the district; and (3) the EDA could use the statutory quick-take provision to condemn the properties because condemnation was reasonably necessary to obtain a binding development agreement and because the TIF funds must be used before July 22, 2008, or be forfeited.

The property owners appeal.

## ISSUE

Did the district court err by concluding that the EDA had the power to condemn the property owners' parcels for redevelopment when the city had not entered a binding development agreement?

## ANALYSIS

The property owners argue that the EDA exceeded its authority by condemning their parcels because the city resolution adopting the redevelopment plan expressly incorporates that plan, including its specific restriction that requires the city to enter a binding development agreement before it takes property by eminent domain: "Prior to formal consideration of the acquisition of any property, the city will require the execution of a binding development agreement with respect thereto and evidence that Tax Increments or other funds will be available to repay the Public costs associated with the proposed acquisition." Despite this language, the district court found that the EDA did not exceed its authority by condemning the property owners' parcels because it interpreted the redevelopment plan as authorizing the EDA to condemn property even without a binding development agreement in place. The property owners contest that interpretation and argue that the district court should have relied on it to prohibit the condemnation.

■■■ "Courts may interfere only when the [condemning] authority's actions are manifestly arbitrary or unreasonable." *Housing & Redev. Auth. v. Minneapolis Metro. Co.*, 259 Minn. 1, 15, 104 N.W.2d 864, 874 (1960). An authority acts in an arbitrary or unreasonable manner when it acts "without basis in law or under conditions which do not authorize or permit the exercise of the asserted power." *Id.* To decide whether the EDA acted in an arbitrary or unreasonable manner, the district court therefore had to determine the scope of the EDA's authority with respect to the Cedar Grove redevelopment project.

■■■ The EDA urges that we credit the district court's conclusion that the EDA acted within its authority. An appellate court need not give deference to a district court's decision on a legal issue. *Frost–Benco Elec. Ass'n v. Minn. Pub. Util. Comm'n*, 358 N.W.2d 639, 642 (Minn. 1984). Whether a condemning authority has the power to condemn property is a question of law. *See Minn. Canal & Power Co. v. Fall Lake Boom Co.*, 127 Minn. 23, 28, 148 N.W. 561, 562 (1914) (whether a taking is authorized by law is a question for the courts); *see also* 11 McQuillin *Mun. Corp.* § 32.25 (3d ed.2000) (distinguishing legislative and judicial questions in the context of eminent domain and stating that "it is generally the function of the judicial department to determine the existence and limits of the power"). We therefore review de novo the scope of the EDA's condemnation authority.

■■■ The EDA is a public body, separate and distinct from the city, organized under the Minnesota Statutes. It has the authority to engage in development and redevelopment activities. *See* Minn.Stat. §§ 469.090–.1082 (2008). An economic development authority may be vested with the power to condemn property. Minn. Stat. § 469.101, subd. 4 (providing that

"[t]he [EDA] may acquire by lease, purchase ... or condemnation proceedings the needed right, title and interest in property to create economic development districts"). But an economic development authority's powers are limited by the scope of authority that a city, as the original condemning authority, transfers to it:

The city may, by resolution, transfer the control, authority, and operation of any project ... located within the city ... to the economic development authority.... The economic development authority may exercise all of the powers that the governmental unit establishing the project could exercise with respect to the project.

Minn.Stat. § 469.094, subd. 2. Section 469.094, subdivision 2, informs our analysis in three ways: first, it provides that a city may by resolution transfer control and operation to an economic development authority on a project-by-project basis; second, the economic development authority acquires and may exercise the powers that a city possesses and transfers with respect to the project; and third, because the economic development authority acquires its power as transferred from the city, it does not acquire and cannot exercise powers greater than the city could exercise with respect to the project or greater than the city chose to transfer.

The EDA apparently recognized that its authority regarding Cedar Grove was subordinate to the city's authority, because the EDA's own resolution of August 7, 2001, conditioned the establishment and adoption of the plans on the approval of the city council. The EDA resolved that "[c]onditioned upon the approval thereof by the City Council following its public hearing thereon, the [redevelopment plan and TIF plan], as presented to the EDA on this date, are hereby approved, established and adopted."

The manner of the city's approval and adoption of the plans are particularly important to our analysis, because the city incorporated the plans as part of a resolution. The city council reviewed the TIF plan and redevelopment plan and held a public hearing on October 2, 2001. The city council then adopted resolution 01–63, which, among other things, established Cedar Grove as a TIF district. The city's resolution noted that "[t]he EDA and the City have investigated the facts relating to the Plans and have caused the Plans to be prepared." In a section labeled "Findings for the Adoption and Approval of the Plans," the city found that "the Plans[ ] are intended and, in the judgment of this Council, the effect of such actions will be, to provide an impetus for development in the public purpose and accomplish certain objectives as specified in the Plans, *which are hereby incorporated herein.*" (Emphasis added.)

■ By *incorporating* the actual redevelopment plan into resolution 01–63, the city adopted restrictions on the project as stated in the redevelopment plan and evidenced its intent to be bound by its terms. "[A] resolution is a formal expression of the will or settled decision of a deliberative assembly." *Lindahl v. Indep. Sch. Dist. No. 306,* 270 Minn. 164, 168, 133 N.W.2d 23, 26 (1965). Because a city may not violate its own enactments, *see* 5 McQuillin *Mun. Corp.* § 15.12 (discussing ordinances and resolutions and explaining that a city may not violate its own legislative decision), neither can a subordinate entity to whom the city transferred its authority. Because a city's resolution is a legislative decision, *Mendota Golf, LLP v. City of Mendota Heights,* 708 N.W.2d 162, 180 (Minn.2006), and because the redevelopment plan was incorporated by resolution 01–63, we hold that the city intended every provision in the plan to have its full effect.

We therefore look to the terms of the redevelopment plan, including any restrictions, to determine the scope of the authority transferred to the EDA with respect to property acquisition in Cedar Grove. The redevelopment plan contains two provisions regarding property acquisition. The first is in section 1–8, which includes limiting language:

The Redevelopment Plan contemplates that the City may acquire property and reconvey the same to another entity. *Prior to formal consideration of the acquisition of any property, the City will require the execution of a binding development agreement with respect thereto* and evidence of Tax Increments or other funds will be available to repay the Public Costs associated with the proposed acquisition.

(Emphasis added.) The second provision is section 1–12, which is a broader statement of acquisition of land: "The City may acquire such property, or appropriate interest therein, within the Redevelopment Project Area as the City may deem necessary or desirable to assist in the implementation of the Redevelopment Plan."

Despite the EDA's acknowledgment that no binding development agreement exists, the district court granted the EDA's condemnation petition because it interpreted the broad language as swallowing the limiting language, giving the limiting language no effect:

The language in section 1–8 of the Redevelopment Plan, when read in conjunction with other provisions of the Plan, does not preclude the taking of property absent a binding development agreement. Section 1–12, for example, allows the EDA, when it is necessary and desirable, as it is here, to acquire [the property owners' parcels] to assist in the implementation of the Redevelopment Plan.

■ Our de novo review of the operative language in the redevelopment plan yields a different interpretation. Section 1–12 relates to the EDA and the city's general power to acquire property in Cedar Grove. It provides the full extent of the city's *possible* acquisition of land, generally allowing the city to acquire any interest in *any* property in the redevelopment area "necessary or desirable" to the redevelopment project. But section 1–8 unequivocally qualifies and limits that broad and general power of the city by specifying that "[p]rior to formal consideration of the acquisition of any property, the City *will require* the execution of a binding development agreement." (Emphasis added.) We therefore disagree with the district court's interpretation of the redevelopment plan. Because the city's resolution incorporating the redevelopment plan voluntarily limited its power of eminent domain and unambiguously requires a binding development agreement before the acquisition of any property in Cedar Grove, the EDA had no power under the resolution to condemn the property owners' parcels before the city executed a binding development agreement. Because the EDA violated the resolution, it acted "under conditions which do not authorize or permit the exercise of the asserted power." *Housing & Redev. Auth.,* 259 Minn. at 15, 104 N.W.2d at 874. We find no support for the district court's order condoning the EDA's condemnation of the property owners' parcels.

We are not persuaded otherwise by the EDA's arguments. The EDA advances several arguments contending either that its powers are not limited by section 1–8 of the redevelopment plan or that it did not violate the limiting provision. None of the arguments are compelling.

■■ The EDA argues that the district court accurately read the redevelopment plan as not requiring a binding

development agreement before condemnation. The immediately apparent problem with the district court's interpretation, which the EDA asks us to adopt, is that it disregards two well-worn maxims of statutory interpretation: First, a statute should be interpreted to give effect to all of its provisions, and, second, to the extent two provisions cannot be reconciled, the more specific provision should prevail over the general. *Rosenquist v. O'Neil & Preston*, 187 Minn. 375, 380, 245 N.W. 621, 623–24 (1932); *cf.* Minn.Stat. § 645.26 (2008) (providing interpretation of statutes should attempt to give effect to all provisions but in the event of irreconcilable provisions, specific prevails over general). Contrary to the EDA's invitation to disregard section 1–8, we can reasonably give effect to both provisions by applying these principles so that neither part of the resolution is superfluous or insignificant.

The EDA asserts that even if section 1–8 expressly limits *the city's* authority to condemn property in Cedar Grove, the limitation is not binding on *the EDA.* The argument has appeal only on its face. Again, "[p]rior to formal consideration of the acquisition . . . *the city* will require the execution. . . ." The reference to "the city" rather than to the EDA does not alter our conclusion. When a city transfers management and control of a project to an economic development authority, the transfer-of-authority statute explicitly provides that "[t]he economic development authority may exercise all of the powers that the governmental unit establishing the project could exercise with respect to the project." Minn.Stat. § 469.094, subd. 2. The EDA could exercise no more power than the city possessed and intended to transfer with respect to property acquisition. The EDA cites Minnesota Statutes section 469.101 to support its contention that it has the general power to condemn property to create economic development districts. But the EDA's powers are conferred by the city on a project-by-project basis under section 469.094, subdivision 2. Under section 1–8 of the development plan, the city resolved to limit its transferred power to condemn property in Cedar Grove. Because the city did not intend to acquire property in Cedar Grove without first executing a binding development agreement, it did not convey to the EDA the power to condemn property in disregard of that limitation.

The EDA next argues that the redevelopment plan creates no unique rights for the property owners and therefore the property owners may not rely on it to limit the city's or the EDA's powers. Whether or not the redevelopment plan itself creates unique rights for the property owners, it explicitly limits the power of the city and was incorporated as a city resolution. Consequently, it limits the power transferred to the EDA to condemn the owners' properties. Our focus is on the EDA's delegated power to condemn the property, not on each property owner's asserted right to retain the property.

The EDA acknowledges that a city may impose limits on an economic development authority, but it contends that a city can do so only in the enabling resolution that creates it. It argues that it cannot be bound by the city's resolution that incorporates the redevelopment plan because the resolution "is not an enabling statute nor an enabling resolution." This argument suggests that if a city fails to limit the powers of an economic development authority in a resolution that establishes the authority, the city cannot later restrict the authority's powers. The argument is unavailing.

 We observe that the initial enabling resolution establishing the EDA is

not in the record. The record also does not reveal when the EDA was established, although we know that it existed before resolution 01–63 established Cedar Grove as a redevelopment area because the record contains EDA resolutions passed before October 2001. But this uncertainty about the EDA's origin is not critical to our analysis. The Minnesota Statutes allow a city to impose broad restrictions when it creates an economic development authority. *See* Minn.Stat. § 469.092, subd. 1. Section 469.092, entitled "Limit of Powers," not only provides seven broad limits that a city may impose on the actions of an economic development authority, it also adds a sweeping catch-all provision that a city may impose "any other limitation or control established by the city council by the enabling resolution." *Id.* We read this provision to give a city extensive discretion to limit an economic development authority's powers. And this broad discretion to restrict a development authority's power is not limited to the development authority's moment of origin because the legislature also allows cities to modify enabling resolutions "at any time." Minn.Stat. § 469.092, subd. 2. So even if the original enabling resolution conveyed limitless condemnation power to the EDA, the resolution that authorized the Cedar Grove Project limits that power expressly.

Additionally, both parties recognize that resolution 01–63 is the legislation that authorized the Cedar Grove project. Because section 1–8's restriction was incorporated into that resolution, for reasons already explained we read it as a restriction on the EDA's authority to acquire property in Cedar Grove. The EDA's focus on statutes that generally give the EDA broad powers ignores the statutory framework indicating that the EDA acquires its condemnation power from the city that transfers its own power. This hierarchical scheme of eminent domain power is well established. *See State v. Christopher,* 284 Minn. 233, 238, 170 N.W.2d 95, 99 (1969) (providing that "not all condemnors in the hierarchy of entities having the power of eminent domain enjoy the same rights and powers").

The EDA cites Minnesota Statutes section 469.029 and contends that the EDA may modify a redevelopment plan when it determines that the change is necessary. We need not address the details of this argument because it ignores the logical consequence of the city's express restriction and because it wanders away from our facts. *State v. DeWalt,* 757 N.W.2d 282, 290 (Minn.App.2008) (explaining that this court declines to address arguments that "have no apparent import"). While the cited statutes give the EDA the authority to modify a redevelopment plan, the EDA cites no statute that gives it the authority to add to the powers granted to it by the city after the city transfers its authority by resolution. The EDA lacks authority to expand the eminent domain power of the city and it lacks authority to amend any city resolution. In any event, it is irrelevant whether the EDA *might have* acted within its authority *if it had* modified the redevelopment plan because the record establishes that it never did. The EDA simply pursued condemnation proceedings without waiting for the city to execute the required binding development agreement. Initiating condemnation proceedings before executing a development agreement for the project was something the city resolved not to do, and something it never granted the EDA the authority to do in its place.

The EDA argues finally that section 1–8 regards only reuse of property and does not apply to property acquisition. This argument is based on the fact that section 1–8 is entitled "Proposed *Reuse* of Property." (Emphasis added.) The argument is

not persuasive because the operative language in section 1–8 speaks directly to acquisition, not reuse, of the property. Our analysis considers the operative language of a provision, not primarily its title. *See Rice v. City of St. Paul,* 208 Minn. 509, 519, 295 N.W. 529, 533–34 (1940) (explaining that "only where the language of an act is ambiguous, and needs, by reason of such ambiguity, to be judicially construed, that ... its title should be resorted to for aid in its construction") (quotations and citations omitted).

## DECISION

We hold that the city's resolution establishing the redevelopment project expressly limited the authority to acquire property for the project and that the EDA was bound by those limits when the city transferred to the EDA the city's power of eminent domain. The EDA exceeded the limited powers that the city transferred to it under resolution 01–63 and the redevelopment plan, which provided that the property owners' parcels would not be taken unless the city executed a binding development agreement respecting the project. Because the EDA exceeded its powers, we reverse the district court's order granting the EDA's quick-take condemnation petition.

**Reversed.**