## CRYSTAL BEACH BAY ASSOCIATION v. COUNTY OF KOOCHICHING AND OTHERS.

243 N. W. 2d 40.

June 4, 1976—No. 45687.

---

[3] See, e. g., Kirkpatrick v. Peet, 247 Ore. 204, 428 P. 2d 405 (1967); Murphy v. Daumit, 387 Ill. 406, 56 N. E. 2d 800 (1944).

Robert J. Leali and Patrick J. Ciliberto, for appellant.
John D. Furuseth, for respondent Bohman.
David C. Johnson, County Attorney, for other respondents.

Heard before Peterson, MacLaughlin, and Scott, JJ., and considered and decided by the court en banc.

PETERSON, JUSTICE.

The Board of Commissioners of Koochiching County (hereafter "county board"), pursuant to the recommendation of its Planning and Zoning Advisory Commission (hereafter "planning commission"), approved Frank E. Bohman's application for a conditional-use permit to build a boat marina on Crystal Beach Bay on the south shore of Rainy Lake. The Crystal Beach Bay Association (hereafter "association") consists of the owners of 17 lakeshore properties near the site of the proposed marina.[1] The property owners appeared as objectors before the planning commission and county board. After Bohman's application was approved over their objections, the association commenced an action for a declaratory judgment and an injunction against issuance of the permit and construction of the marina. The essence of the association's complaint is that the county board acted arbitrarily and unreasonably without sufficient evidence to support the findings which were required under the county zoning ordinance for approval of a conditional use. The trial court found against the association and this appeal followed.

Crystal Beach Bay is a small bay of approximately 20 acres, located 6 miles east of the city of International Falls and 6½ miles west of the Voyageurs National Park. Bohman owns a 40-

---

[1] Among the lakeshore property owners represented by the association, 5 were situated on the bay, 3 to the west of the bay, and 9 to the northeast. Owners of other properties in the same vicinity, including at least 6 on the bay itself, have not joined the association or otherwise objected to the conditional-use permit.

acre parcel fronting on the southeastern part of the bay, at the junction of Highway No. 11 and County Road No. 94. The proposed marina site is a shrub swamp vegetated with a variety of lowland species. This tract and the other lakeshore properties are zoned "residential R-2." The county zoning ordinance provides that a marina may be built in such an area only if a conditional-use permit is granted by the county board.[2]

The county zoning ordinance provides a two-step procedure for the consideration and determination of an application for a conditional-use permit. First, the application is to be reviewed by the planning commission which, upon majority vote, shall submit its recommendation with a "detailed report" to the county board. The planning commission may, if it deems it in the public interest, conduct a public hearing prior to making its recommendation. Here, the planning commission did conduct a public hearing before recommending approval to the county board. No detailed report was prepared, but the hearing testimony was transcribed.

The second and more important step consists of proceedings before the county board. Subject to the discretionary authority to "establish reasonable safeguards to assure adequate protection of adjoining properties and the neighborhood," the conditional-use permit "shall be granted" if it is found that:

(1) "The conditional use will not be injurious to the use and enjoyment of the environment, or detrimental to the rightful use and enjoyment of other property in the immediate vicinity, or neighborhood, nor substantially diminish and impair property values within the surrounding neighborhood";

(2) "The establishment of the conditional use will not impede

---

[2] In Zylka v. City of Crystal, 283 Minn. 192, 195, 167 N. W. 2d 45, 48 (1969), we described a conditional use as one which, "although generally compatible with the basic use classification of a particular zone, should not be permitted to be located as a matter of right in every area included within the zone because of hazards inherent in the use itself or special problems which its proposed location may present."

the normal and orderly development and improvement of surrounding property for uses predominant in the area"; and

(3) "The location and character of the proposed development are considered to be consistent with a desirable pattern of development for the locality in general."

The county board failed to expressly make the critical findings required by the zoning ordinance. This was a significant omission for, as we said in Zylka v. City of Crystal, 283 Minn. 192, 198, 167 N. W. 2d 45, 50 (1969), a prima facie case of arbitrariness exists if the county board's decision is not accompanied by findings to show that its action "was reached upon a consideration of the facts and was based upon reason rather than the mere individual whim of the * * * members." We have held, however, that this prima facie case may be rebutted if there is evidence in the recorded hearing testimony from which the reviewing court can ascertain a reasonable basis for the county board's action. Board of Benton Township v. Carver County Board, 302 Minn. 493, 498, 225 N. W. 2d 815, 819 (1975). More important, however, the association expressly concedes that the required findings were implicit in the county board's approval of Bohman's application. Thus, the fundamental issue is whether there is sufficient evidence to sustain those findings.

In addition to these requirements of the zoning ordinance, the county has adopted a policy for development of the perimeter area around the Voyageurs National Park to "[e]ndorse marina development only after extensive economic feasibility studies show the needs and environmental impact statements have dealt with adverse environmental aspects." No such studies were made or considered by the county board here. We have indicated in Board of Benton Township v. Carver County Board, 302 Minn. 493, 501, 225 N. W. 2d 815, 820, that a zoning decision is not arbitrary per se for failure to act in conformity with policies extrinsic to the zoning ordinance, in that case a comprehensive development plan. Nevertheless, such extrinsic policies are clearly relevant on review, particularly in this case where (1) the

perimeter development policy relates specifically to the conditional use applied for by Bohman and (2) the zoning ordinance itself requires findings with respect to development planning. Therefore, the absence of economic feasibility studies and environmental impact statements is relevant to the fundamental issue of evidentiary support for the county board's implicit findings.

We would have considerable difficulty sustaining the county board's action on the basis of evidence presented in testimony at the planning commission hearing or before the subsequent county board meeting. However, that evidentiary support has been reinforced by related proceedings before the Minnesota Department of Natural Resources (hereafter "DNR") occurring after the county zoning decision and after review of the county's decision by the trial court. Although the county's approval of Bohman's application for a conditional-use permit was a land-use decision, all of the substantive factors to be considered under the zoning ordinance and perimeter development policy are inextricably intertwined with lake-use considerations, both because of the location of Bohman's property on the lakeshore and because of the nature of the proposed conditional use. The DNR has recently approved Bohman's application for a permit to dredge access channels for the marina, pursuant to Minn. St. 105.42, subd. 1. The detailed findings of the DNR in that proceeding, made after a public hearing at which the association participated, remedy any procedural deficiencies at the county level and strengthen the evidentiary support for the county board's decision.[3] Although an appellate court is ordinarily limited to a consideration of matters contained in the record before it, we think it has inherent power to look beyond the record

---

[3] An additional dredging permit must also be obtained from the United States Army Corps of Engineers pursuant to § 10 of the Rivers and Harbors Appropriation Act of 1899, 33 USCA, § 403, which will consult with the United States Fish and Wildlife Service pursuant to 16 USCA, § 662, and 33 CFR § 209.120(g)(4) (Rev. 1975).

where the orderly administration of justice commends it. See, Baker v. Aetna Casualty & Surety Co. 193 S. W. 2d 363, 366 (Mo. App. 1946).

With respect to the first finding required by the zoning ordinance—that the marina would not substantially diminish surrounding property values or be injurious to the use and enjoyment of those properties—we will summarize the relevant objections raised before the planning commission and county board, and the countervailing arguments and evidence supporting an implicit finding by the county board. Two property owners, including one located immediately adjacent to the proposed marina site and another north of the bay, testified that they purchased their property in reliance on their belief that residential use of surrounding property would continue. However, this reliance was not reasonable under a zoning ordinance which permits marina development as a conditional use. Similarly, the objection of one witness regarding intrusion of heavy boat traffic in an area of small family beaches where the safety of swimming children might be jeopardized is not critical because swimmers have no absolute right to exclude other uses under a zoning ordinance which permits marinas conditionally in residential areas. Another witness testified that her family draws drinking water from the bay, but the DNR found:

"Nine private residences are located along the shoreline of Crystal Beach Bay. Approximately 12 residences draw water from Crystal Beach Bay, but drinking water is transported to these homes from municipal water sources."

Other witnesses complained about increased automobile traffic on access roads and boat traffic on the bay, the anticipated cost of additional police protection, and annoying noise. These objections are too general to require denial of Bohman's conditional-use permit. While Bohman presented little in the nature of affirmative proof that surrounding property values would not be impaired, we think the county board could reasonably have made

the requisite finding because of the absence of any substantial complaints by Bohman's neighbors. Not only are the complaints summarized above relatively insubstantial in character, but it is also noteworthy that many of Bohman's neighbors, including six on the bay itself, have not objected to the marina at all.

The second and third findings required by the zoning ordinance relate to planning for orderly development, and in this case coincide with the perimeter development policy that marinas be endorsed only after economic feasibility studies. Objectors testified on the basis of their own informal inquiries that existing marinas could be expanded to meet anticipated demand for berthing spaces. However, the DNR found:

"The demand for mooring space in a full service marina exceeds current availability in the International Falls vicinity."

Other objections based on economic feasibility concerned soundings done by a member of the association, which led him to conclude that the bay was in most places too shallow to bear larger boats which would be launched from the proposed marina. The reliability of these soundings is subject to question because they were done through ice and during a period when the water level was acknowledged to have been low. It is evident from the following DNR finding that other presumably more reliable soundings indicated that the bay could bear marina traffic if a 150-foot access channel were dredged, as permitted:

"* * * Soundings of Crystal Beach Bay indicate that the entrance channel must be dredged 150 feet lakeward in order to provide a channel depth of 5 feet at a lake elevation of 1108 feet, MSLD."

Accordingly, we conclude that all feasibility objections have received appropriate attention at the DNR and have reasonably been resolved in favor of the marina.

Finally, with respect to the perimeter development policy requirement for environmental impact studies, we note that the DNR, which has the most pervasive interest in the environment,

has approved the project. The principal objections raised before the planning commission and county board related to siltation and erosion affecting water quality. Regarding turbidity from siltation and erosion, there was contrary testimony before the planning commission that such turbidity was an existing problem caused by winds roiling the waters. Confirming this testimony, the DNR found:

"Crystal Beach Bay becomes turbid due to local shoreline erosion when the bay is exposed to northerly winds and attendent [sic] wave action.

\* \* \* \* \*

"Some increase in turbidity may result from boating activity on Crystal Beach Bay if the marina is constructed. This impact, however, is insignificant in relation to the existing erosion and turbidity conditions of the bay."

Further, the DNR has imposed conditions on its permit to insure that turbidity is controlled during dredging operations.

A second environmental objection voiced at the planning commission hearing by a representative of the United States Fish and Wildlife Service was that the proposed dredging and marina construction would be detrimental to fish and wildlife resources. However, contrary testimony before the planning commission showed that sport fishing in the area was already poor. The DNR found:

"\* \* \* The proposed marina site is not a good resource area for fish and wildlife and any affect [sic] on fish or wildlife will be minimal.

"Although testifying in opposition to the project representatives of the U. S. Army Corps of Engineers and the U. S. Fish and Wildlife Service had no substantiating evidence of adverse environmental impacts which would occur if the project is implemented as proposed."

A third environmental objection raised before the planning commission concerned the possibility of pollution from oil and

60

gas. But the DNR has retained the power to terminate Bohman's permit or order corrective action in the event of "pollution from fuel service facilities, boat storage, sewage pump-out and associated marina facilities." Thus, all environmental objections have been considered and resolved in favor of the proposed marina on the basis of evidence presented before the planning commission and county board, as reinforced by the subsequent DNR findings.

In summary, while the planning commission and county board here have disregarded the procedural requirements of their zoning ordinance and perimeter development policy to the extent that Zylka v. City of Crystal, *supra*, would require reversal in another case, we conclude in this unique situation of intergovernmental checks and balances that the substantive purposes of the zoning ordinance and perimeter development policy are fully served by an affirmance of the decision of the trial court.

Affirmed.