EAGAN ECONOMIC DEVELOPMENT
AUTHORITY, Appellant,

v.

U–HAUL COMPANY OF MINNESOTA
a/k/a U–Haul Co. of Minnesota, et
al., Respondents,

Randall J. Quam, et al., Respondents,

Larson Training Services, Inc., d/b/a
Larson's Automotive Repair
Services, Respondents,

Minnesota's Credit Union, et al., Irma
L. Parranto, et al., Jamal D. Ansari,
et al., Respondents Below.

No. A08–767.

Supreme Court of Minnesota.

July 29, 2010.

Robert B. Bauer, Michael G. Dougherty, Jessica L. Sanborn, Severson, Sheldon, Dougherty & Molenda, P.A., Apple Valley, MN, for appellant.

Daniel L. Scott, Leonard, Street and Deinard, Minneapolis, MN, for respondents U–Haul Company of Minnesota a/k/a U–Haul Co. of Minnesota, et al.

Steven J. Quam, Fredrikson & Byron, P.A., Minneapolis, MN, for respondents Randall J. Quam, et al.

Gary G. Fuchs, Elizabeth E. Rein, Gary G. Fuchs, Attorney at Law, P.A., Eagan, MN, for respondent Larson Training Services, Inc., d/b/a Larson's Automotive Repair Services.

Susan L. Naughton, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Jason A. Adkins, Lee U. McGrath, Minneapolis, MN, for amicus curiae Institute for Justice Minnesota Chapter.

## OPINION

ANDERSON, PAUL H., Justice.

In late 2002, the Eagan Economic Development Authority (EDA) filed a quick-take condemnation petition with the Dakota County District Court in an effort to obtain title to several pieces of private property, including property owned by respondents. The EDA sought to take the property as part of a redevelopment project in the Cedar Grove area of Eagan. The court granted the quick-take petition. The property owners appealed and the court of appeals reversed, concluding that the EDA exceeded the scope of its authority in condemning the property without first securing a binding development agreement for the property. We reverse and remand to the court of appeals.

The City of Eagan is redeveloping the "Cedar Grove Redevelopment Area," a 250–acre parcel of land east of the intersection of Cedar Avenue (Highway 77) and Highway 13. The City undertook the redevelopment project to "reawaken the spirit and vitality of [that] part of Eagan" and to "replac[e] a market obsolete regional shopping center." The project includes plans to change the "core area" of the redevelopment area, which is in the southeast quadrant of Cedar Avenue and Highway 13, into a mixed-use development that includes retail establishments, restaurants, and housing.

*Redevelopment Plans and Documents*

The Eagan Economic Development Authority (EDA), appellant in this case, is responsible for furthering the Cedar Grove Redevelopment Project. It appears that at the time the Redevelopment Project was established, the Eagan City Council members also served as EDA commissioners. In an August 7, 2001 resolution, the EDA adopted two documents drafted by its financial consultant, Ehlers & Associates. These documents were the "Redevelopment Plan for the Establishment of the Cedar Grove Redevelopment Project Area" (Redevelopment Plan) and the "Tax Increment Financing Plan for the Establishment of Tax Increment Financing District No. 1 within the Cedar Grove Redevelopment Area" (TIF Plan). Of particular relevance to this appeal is Subsection 1-8 of the Redevelopment Plan, titled "Proposed Reuse of Property," which states:

> The Redevelopment Plan contemplates that the City may acquire property and reconvey the same to another entity. *Prior to formal consideration of the acquisition of any property, the City will require the execution of a binding development agreement with respect thereto* and evidence that Tax Increments or other funds will be available to repay the Public Costs associated with the proposed acquisition.

(Emphasis added.) Also relevant to the appeal is Subsection 1-12, titled "Property Acquisition." This subsection states that "[t]he City may acquire such property, or appropriate interest therein, within the Redevelopment Project Area as the City may deem to be necessary or desirable to assist in the implementation of the Redevelopment Plan." The TIF Plan does not contain the language found in Subsection 1-8 or a similar binding development agreement requirement.

The EDA's approval of both the Redevelopment Plan and the TIF Plan was "[c]onditioned upon the approval thereof by the City Council." On October 2, 2001, the City Council passed Resolution 01–63, which "approved, ratified, established, and adopted" both the Redevelopment Plan

and TIF Plan. Over a year later, on July 22, 2003, the Dakota County Treasurer–Auditor certified the TIF District.[1] Redevelopment in the Cedar Grove Redevelopment Area was expected to occur in stages over the next two to seven years.

After the EDA and the City Council both adopted the Redevelopment Plan and TIF Plan, the EDA began to acquire properties in the Cedar Grove Redevelopment Area through negotiation and purchase. The EDA initiated and completed some redevelopment in the area, including street intersection improvements and various residential projects and commercial remodeling projects, but much of the planned redevelopment never occurred. Several different developers submitted development proposals, and the EDA pursued those proposals, but the projects did not materialize because the developers withdrew their proposals.

*Condemnation Proceedings*

By July 2007, the City had acquired title to approximately 80 percent of the property in the core redevelopment area. At this time, one year remained in the five-year time period for expending TIF funds, which time period was by statute set to expire on July 22, 2008. *See* Minn.Stat. § 469.1763, subd. 3 (2002). In August 2007, the EDA passed a resolution determining that acquisition of the properties comprising the remaining 20 percent of the core area was "necessary to carry out the Redevelopment Plan." In November 2007, the EDA gave notice to the remaining property owners within the core area of its intention to take possession of their property. The EDA then filed a quick-take condemnation petition in district court for the taking of thirteen properties.

The property owners of seven of the thirteen properties did not formally object to the condemnation and the district court granted the EDA's petition with respect to those properties. The other six property owners objected and the court held an evidentiary hearing to consider the condemnation petition. At this hearing, the six property owners claimed that the EDA did not meet its burden of proof regarding public purpose, necessity, or authority for the taking, or its burden of proof regarding necessity of the quick take. In regard to the EDA's authority for the taking, the property owners argued that Subsection 1–8 of the Redevelopment Plan requires the execution of a binding development agreement before the EDA can condemn property and that such an agreement did not exist.

At the evidentiary hearing, witnesses for the EDA acknowledged that the EDA did not have a binding development agreement with any developer but explained that the EDA was working with a certain developer to create a conceptual redevelopment plan. The district court found that the EDA had authority to take the property owners' properties even though the EDA had not yet executed a binding development agreement. The court's order states that the Redevelopment Plan "contemplate[s] that the EDA would be able to acquire the necessary properties in order to insure the appropriate implementation of the Redevelopment Plan," and that "[Subs]ection 1–8 of the Redevelopment Plan, when read in conjunction with other provisions of the

---

1. At the condemnation hearing, a city consultant testified that a tax-increment-financing district is a geographic area in which market value of property is "frozen" once the district is established. As the market value of the properties increases after development, the difference in property tax revenue between the tax gained from the frozen market value and the tax gained from the new market value—tax increments—is captured and is used to reimburse cities for development expenses.

Plan, does not preclude the taking of property absent a binding development agreement."

The district court also found that acquisition of the properties was necessary for a public purpose[2] and that utilization of quick-take procedures was appropriate because of the impending expiration of the five-year period for expending TIF funds. The court specifically found that if the "City" did not acquire the properties before July 2008, it would not be reimbursed under the TIF Plan for the estimated $3 million cost of the property acquisition. Based on these findings, the court granted the EDA's condemnation petition and authorized the quick take.

*Court of Appeals Decision*

Three of the six objecting parties—respondents U–Haul Co. of Minnesota and AMERCO Real Estate Company, Randall J. Quam and Sandra K. Quam and Competition Engines, Inc., and Larson Training Services, Inc. (hereinafter property owners)—appealed the district court's condemnation order to the Minnesota Court of Appeals, arguing that the taking was not supported by findings of public purpose or necessity and that the EDA failed to show that it was entitled to utilize quick-take procedures. *Eagan Econ. Dev. Auth. v. U–Haul Co. of Minn.*, 765 N.W.2d 403, 403, 404–05 (Minn.App.2009). More specifically, the property owners argued that there was no public purpose for the taking

because there was no specific intended use for the property and because the EDA did not have a binding development agreement. *See id.* at 404, 406. The EDA's enabling resolution was not part of the record before the court of appeals. *Id.* at 410–11.

The court of appeals reversed the district court, holding that the EDA exceeded the scope of its authority in condemning the property without first having a binding development agreement in place. *See id.* at 411. To reach this conclusion, the court relied on Minn.Stat. § 469.094, subd. 2 (2008). Section 469.094, subdivision 2, provides that when a city transfers a redevelopment project from one entity to another, the transferee may exercise only the powers that the entity establishing the project could exercise with respect to the project. The court concluded that the City transferred the Cedar Grove Redevelopment Project to the EDA in Resolution 01–63 and therefore additionally concluded that under Minn.Stat. § 469.094 the EDA could not "exercise powers greater than the city could exercise with respect to the project." *Eagan Econ. Dev. Auth.*, 765 N.W.2d at 407.

The court of appeals further concluded that Subsection 1–8 of the Redevelopment Plan prohibited the City from acquiring the property without first having a binding development agreement in place. *Id.* at

---

2. In 2006, the Legislature amended chapter 117. Act of May 19, 2006, ch. 214, §§ 1–22, 2006 Minn. Laws 195, 195–206 (codified as amended at Minn.Stat. §§ 117.012–.52 (2008)). The amended statute defines public use for purposes of eminent domain and explicitly states that "[t]he public benefits of economic development, including an increase in tax base, tax revenues, employment, or general economic health, do not by themselves constitute a public use or public purpose." Minn.Stat. § 117.025, subd. 11(b) (2008). The parties agree that the 2006 amendment does not apply to the takings at issue here because the effective date provision of the amendment exempts takings associated with TIF district projects if the TIF district was certified before February 1, 2006, and the condemnation proceeding was filed on or before February 1, 2008. Act of May 19, 2006, ch. 214, § 22, 2006 Minn. Laws 195, 205–06. The Dakota County Treasurer–Auditor certified the TIF District in July of 2003 and the EDA filed its condemnation petition in November of 2007.

408. The court explained that though other provisions of the Redevelopment Plan provided the City with broad powers to acquire property, Subsection 1–8 "unequivocally qualifies and limits" these broad powers. *Id.* According to the court of appeals, the Redevelopment Plan requires the City to have a binding development agreement before it acquires property, and the EDA has no greater power than the City with respect to the Redevelopment Project. *Id.* Based upon this determination, the court concluded that the EDA is required to have a binding development agreement before it can acquire the property owners' property. *Id.* The court then held that "[t]he EDA exceeded the limited powers that the city transferred to it under resolution 01–63 and the redevelopment plan, which provided that the property owners' parcels would not be taken unless the city executed a binding development agreement respecting the project." *Id.* at 411. Having decided the case on the foregoing grounds, the court did not address the property owners' additional arguments regarding public purpose, necessity, or quick-take procedures. We granted the EDA's request for further review.

## I.

The main issue before us is whether the EDA exceeded the scope of its authority when it condemned the property owners' property before it had a binding development agreement with a third party. The EDA argues that it did not exceed its authority in taking the property and offers several alternative theories in support of its argument. As a preliminary matter, the EDA points to Minn.Stat. § 469.091, subd. 2 (2008), which states, "An economic development authority is a public body corporate and politic and a political subdivision of the state." The EDA argues that under this statute, economic development

authorities are separate entities under the law and therefore have separate and distinct powers from a city or a city council. Further, the EDA maintains that its powers are granted by the Legislature, rather than by the City.

The EDA's first theory in support of its argument that it did not exceed its authority is that the court of appeals wrongly concluded that section 469.094 limits its power. This assertion is based on an argument that section 469.094 does not apply. More particularly, the EDA asserts that section 469.094 applies only to situations where a city transfers a redevelopment project from one agency or subdivision to an economic development authority. The EDA asserts that it established the Cedar Grove Redevelopment Project itself and therefore the City could not and did not transfer the Redevelopment Project to it. If the EDA is correct, the rationale used by the court of appeals—that the EDA can have no greater power to condemn property than the City—does not apply and cannot be used to preclude the EDA's actions.

The EDA's second theory is that the Redevelopment Plan cannot act as a limitation on the EDA because the only limit on the EDA's powers is Resolution 00–17—the EDA's enabling resolution. The EDA acknowledges that the enabling resolution can be modified, thereby changing the EDA's powers, but argues that the City did not follow statutory modification procedures when it subsequently adopted the Redevelopment Plan by passing Resolution 01–63. The EDA asserts that the Redevelopment Plan did not and cannot restrict the EDA's eminent domain powers because the Plan does not qualify as a proper modification of the enabling resolution.

Third, the EDA argues that even if the Redevelopment Plan is binding, Subsection 1–8 of the Redevelopment Plan does not limit the EDA's eminent domain powers. The EDA asserts that Subsection 1–8's requirements do not apply to the EDA because the Subsection uses the term "City" and does not explicitly refer to the EDA. The EDA argues that it is a separate entity from the City, and therefore the Subsection restricts only the City.

Fourth, the EDA argues that even if Subsection 1–8 applies to the EDA, the Subsection does not prohibit property acquisition in this instance because the application of the Subsection is limited to the reuse of property, rather than the initial acquisition of property. In other words, the EDA argues that Subsection 1–8 requires the City or the EDA to have a binding development agreement only before acquiring property for "reuse"—namely, immediate reconveyance.

The property owners ask us to affirm the court of appeals on the ground that the EDA acted arbitrarily and unreasonably when it failed to comply with Subsection 1–8, which they describe as the EDA's "own rule." The property owners also argue that we should reject the EDA's argument that the EDA possesses eminent domain power limited only by the EDA's enabling resolution because the EDA did not raise this argument at the district court or the court of appeals. Finally, the property owners assert that the City has the authority to limit the EDA's power and did so in Subsection 1–8. The property owners maintain that the word "City" in the Redevelopment Plan is inclusive of the EDA and that Subsection 1–8 applies to any method or instance of property acquisition.

■ To resolve the issue before us, we must determine whether Resolution 01–63 and the plans it incorporates restrict the EDA's eminent domain power. Answering this question requires us to interpret certain Minnesota statutes and local city resolutions. The interpretation of statutes and municipal resolutions involves questions of law we review de novo. *Weston v. McWilliams & Assocs.*, 716 N.W.2d 634, 638 (Minn.2006); *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608 (Minn.1980); *cf. Hursh v. Village of Long Lake*, 247 Minn. 1, 5, 75 N.W.2d 602, 605 (1956) (interpreting a municipal resolution to decide if it conformed to statutory requirements).

## A. Consideration of the EDA's Enabling Resolution

■ Before directly addressing whether the EDA exceeded the scope of its power when it condemned the property owners' property without first having a binding development agreement in place, we must address whether we can consider the EDA's enabling resolution. If we conclude that we can consider the enabling resolution we will then address the contents of that resolution. Neither the district court nor the court of appeals considered the EDA's enabling resolution. It appears that none of the parties presented the enabling resolution to the district court or the court of appeals. On appeal, the court of appeals observed that "the initial enabling resolution establishing the EDA" was not in the record. *Eagan Econ. Dev. Auth.*, 765 N.W.2d at 409–10. Nevertheless, the EDA included the enabling resolution in its appendix on appeal to our court and offers the resolution as support for its argument that the EDA derives its eminent domain powers from the Legislature, rather than the City. The property owners argue that we should not consider the enabling resolution because it was not a part of the court record below and is offered in support of a new theory of law.

Usually, an appellate court "may not consider matters not produced and received in evidence below." *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988). But we have taken judicial notice of public records and have said we have the "inherent power to look beyond the record where the orderly administration of justice commends it." *Crystal Beach Bay Ass'n v. County of Koochiching*, 309 Minn. 52, 56–57, 243 N.W.2d 40, 43 (1976); *see also United Power Ass'n v. Comm'r of Revenue*, 483 N.W.2d 74, 77 n. 3 (Minn.1992) (taking judicial notice of a Minnesota Pollution Control Agency permit as a matter of public record). The EDA's enabling resolution was duly enacted by the Eagan City Council, is a local law, and is of public record. Because we conclude that the enabling resolution is a local law and a public record we can and will consider it in deciding this case.

### B. Enabling Resolutions Generally and the EDA's Enabling Resolution Specifically

Having concluded that we can and will consider the EDA's enabling resolution, we next explore the general function of enabling resolutions and the contents of this specific resolution. Enabling resolutions are of particular importance for economic development authorities because they define the scope of an authority's powers. In 1987, the Minnesota Legislature enacted legislation regarding the establishment, actions, and powers of economic development authorities. Act of May 28, 1987, ch. 291, §§ 91–109, 1987 Minn. Laws 1500, 1580–97 (codified as amended at Minn.Stat. §§ 469.090–.108 (2008)). A city may establish an economic development authority by adopting an enabling resolution. *See* Minn.Stat. § 469.091, subd. 1. Under Minn.Stat. § 469.091, subd. 1, an economic development authority may be granted certain powers. These powers include those specifically ascribed to economic development authorities in Minn.Stat. §§ 469.090–.108, as well as housing and redevelopment authority powers delineated in Minn.Stat. §§ 469.001–.047 (2008), and some city powers delineated in Minn. Stat. §§ 469.124–.134 (2008).[3] Among the granted powers is the power to acquire property by condemnation. *See* Minn. Stat. § 469.101, subd. 4. Minnesota Statutes § 469.101, subd. 2, provides that an economic development authority "may exercise the power of eminent domain under chapter 117, or under its city's charter to acquire property."

The Legislature also explicitly provides that an enabling resolution may "impose . . . limits upon the actions" of an economic development authority. Minn.Stat. § 469.092, subd. 1. Further, a city can later change an economic development authority's powers by modifying the enabling resolution. *See* Minn.Stat. § 469.092, subd. 2 (stating that an enabling resolution may be modified if the modification is made in accordance with the applicable statutes). The procedures for making such modifications are outlined in Minn. Stat. § 469.093.

Under Minn.Stat. § 469.091, subd. 1, the City Council established the EDA when it adopted Resolution 00–17, the "Enabling Resolution Establishing an Economic Development Authority for the City of Ea-

---

**3.** Minnesota Statutes § 469.091, subd. 1, states that "[a] city may, by adopting an enabling resolution in compliance with the procedural requirements of section 469.093, establish an economic development authority that, subject to section 469.092, has the powers contained in sections 469.090 to 469.108 and the powers of a housing and redevelopment authority under sections 469.001 to 469.047 or other law, and of a city under sections 469.124 to 469.134 or other law."

gan." In the EDA's enabling resolution, the City Council provided the EDA with the powers of a housing and redevelopment authority under Minn.Stat. §§ 469.001–.047, the powers of a city under Minn.Stat. §§ 469.124–.134, and the powers of an economic development authority as contained in Minn.Stat. §§ 469.090–.108, which include the power to acquire property and to exercise eminent domain. *See* Minn.Stat. § 469.101. In the enabling resolution, the City Council placed six limits on the EDA's authority, including the requirement that "[t]he EDA must submit its plans for development and redevelopment to the City Council for approval in accordance with City planning procedures and laws."

### C. Transfer of Authority Under Section 469.094

■ We next address the question of whether Minn.Stat. § 469.094 supports the court of appeals' conclusion that the EDA exceeded its authority in condemning property without first having a binding development agreement in place. *See Eagan Econ. Dev. Auth.*, 765 N.W.2d at 409, 411. The court of appeals interpreted section 469.094 when it reached the conclusion that the EDA did not have authority to condemn the property owners' property. *Id.* at 407. The property owners assert that the court of appeals correctly concluded that section 469.094 applies to the Cedar Grove Redevelopment Project. The EDA argues that this section is inapplicable here.

Minnesota Statutes § 469.094, subd. 2, provides that when a city, by resolution, *"transfer[s] the control, authority, and operation* of any [economic development district] project ... from the governmental agency or subdivision that established the project to the economic development authority," the authority "may exercise all of the powers that the governmental unit establishing the project could exercise with respect to the project." (Emphasis added.) We find the use of the language "transfer[s] the control, authority, and operation" in the statute to be significant. Further, we conclude that this language indicates that if the City did not transfer the Cedar Grove Redevelopment Project from a "governmental agency or subdivision" to the EDA, section 469.094 does not apply.

Based on the record before us, it appears that the EDA established the Cedar Grove Redevelopment Project and that no transfer of control, authority, or operation of the project ever occurred. Resolution 01–63 states that "[t]he Board of Commissioners ... of the Eagan Economic Development Authority ... has heretofore established the Cedar Grove Redevelopment Area," indicating that the EDA has always had control of the Redevelopment Project. While the property owners urge us to affirm the court of appeals' holding that the EDA can exercise only the powers that the government entity that established the Redevelopment Project could exercise, *see Eagan Econ. Dev. Auth.*, 765 N.W.2d at 407, the property owners do not explicitly identify the government entity that established the Redevelopment Project nor do they assert that the Project was transferred to the EDA. The property owners' failure to support their argument may be because there appears to be no evidence in the record that would demonstrate that the City transferred the control of the Cedar Grove Redevelopment Project from another "governmental agency or subdivision" to the EDA. We note that the district court did not make any finding as to which government entity established the Redevelopment Project because the property owners did not argue this theory to the court. Given the record before us, we conclude that the City did not transfer the

Cedar Grove Redevelopment Project to the EDA from another governmental agency or subdivision. Accordingly, we conclude that Minn.Stat. § 469.094, subd. 2, does not apply under the facts and circumstances of this case and therefore does not limit the EDA's eminent domain powers.

### D. Is the Redevelopment Plan Binding on the EDA?

Having concluded that section 469.094 does not apply, we must consider whether there is any other basis to conclude that the EDA exceeded the scope of its authority when it condemned the property owners' property before the EDA had a binding development agreement with a third party. The property owners argue in the alternative that the Redevelopment Plan, adopted by both the EDA and the City Council, is binding on the EDA and that the Plan prohibits the EDA from taking their property without first having a binding development agreement in place. The EDA argues that the Redevelopment Plan is not binding and that even if the Plan is binding, it does not require the EDA to secure a binding development agreement before taking the property owners' property.

The EDA argues that the Redevelopment Plan is not binding on it because neither the Plan nor the City Council's resolution adopting the Plan is a modification of the EDA's enabling resolution. The EDA asserts that the enabling resolu-

tion demonstrates that it has the power of eminent domain, and that it may exercise that power, absent a modification of the resolution. The property owners argue that the City Council did in fact modify the enabling resolution when it subsequently passed Resolution 01–63 and that those modifications impose compulsory limitations on the EDA.

Minnesota Statutes § 469.092, subd. 2, provides that an enabling resolution—the document that outlines an economic development authority's powers—may be modified at any time, so long as statutory modification procedures in section 469.063 are followed.[4] To modify an enabling resolution, a city council must adopt a written resolution. Minn.Stat. § 469.093, subd. 2. Before adopting such a resolution, a city council must conduct a public hearing, as well as publish a "[n]otice of the time and place of hearing, a statement of the purpose of the hearing, and a summary of the resolution" in a newspaper of general circulation once a week for two consecutive weeks. Minn.Stat. § 469.093, subd. 1.

For at least two reasons, we conclude that the EDA has the stronger argument when it asserts that Resolution 01–63 is not a modification of its enabling resolution. First, nothing in the text of Resolution 01–63 suggests that the City Council intended to modify the EDA's enabling resolution when it enacted Resolution 01–63. Resolution 01–63 does not even mention the enabling resolution, let alone pur-

---

**4.** Minnesota Statutes § 469.093 states:

Subdivision 1. Enabling resolution. The creation of an authority by a city must be by written resolution referred to as the enabling resolution. Before adopting the enabling resolution, the city council shall conduct a public hearing. Notice of the time and place of hearing, a statement of the purpose of the hearing, and a summary of the resolution must be published in a newspaper of general circulation within the city once a week for two consecutive weeks. The first publication must appear not more than 30 days from the date of the public hearing.

Subd. 2. Modifications. All modifications to the enabling resolution must be by written resolution and must be adopted after notice is given and a public hearing conducted as required for the original adoption of the enabling resolution.

port to modify the enabling resolution. Rather, it appears that the intent of the City Council in passing Resolution 01–63 was to adopt the Redevelopment Plan and TIF Plan. Resolution 01–63 is titled "Resolution Adopting the Redevelopment Plan for the Cedar Grove Redevelopment Area; and Establishing [TIF] District No. 1 Within the Cedar Grove Redevelopment Area; and Adopting the [TIF] Plan Therefor." Resolution 01–63 provides that "the EDA and the City" propose that "the City adopt the [Redevelopment Plan] and establish [TIF] District No. 1." Resolution 01–63 also indicates that all City Council members voted to approve, ratify, establish, and adopt the Redevelopment Plan and TIF Plan.

Second, it appears that the City Council did not follow the specific requirements of Minn.Stat. § 469.093 for modifying an enabling resolution. Resolution 01–63 includes a recital claiming that "[t]he EDA and City" notified Dakota County, Independent School District No. 191, and a county commissioner that there was a public hearing "upon published notice," but nothing in the record explicitly demonstrates that notice was given in a manner that conformed to the requirements of Minn.Stat. § 469.093. In fact, the record suggests the City Council did not adhere to section 469.093 requirements. According to an affidavit of publication, the City Council published one "public notice" article regarding the October 2, 2001 public hearing, rather than one notice per week for two consecutive weeks as section 469.093 requires. In addition, the public notice did not include a summary of the resolution, as section 469.093 requires. The public notice did include a statement as to the purpose of the hearing, but said nothing about modifying the EDA's enabling resolution. Instead, the notice stated that the City Council would hold a public hearing "relating to the proposal of the Eagan Economic Development Authority ... to adopt the Redevelopment Plan for the Cedar Grove Redevelopment Area [and] to establish [TIF] District No. 1." Based on this record, we find no support for the property owners' assertion that when the City Council adopted Resolution 01–63, it intended to modify the EDA's enabling resolution or that it followed the appropriate procedures to do so. Accordingly, we conclude that Resolution 01–63 is not a modification of the EDA's enabling resolution.

Even though we conclude that Resolution 01–63 is not a modification of the EDA's enabling resolution, we disagree with the EDA's assertion that it is not bound by the requirements of Resolution 01–63 and the Redevelopment Plan it adopted. Nothing in chapter 469 or the enabling resolution suggests that the EDA is *not* required to comply with project guidelines or plans it creates and that the City Council and the EDA adopt. In fact, the EDA's enabling resolution indicates that the EDA should comply with plans that it prepares, adopts, and submits to the City Council for approval because the resolution requires the EDA to "submit its plans for development and redevelopment to the City Council for approval." This requirement suggests that the EDA must not only comply with any plan it submits to the City Council if the City Council approves the plan, but also that the EDA's actions and powers can be limited on a project-by-project basis. Further, we believe that if we were to conclude the EDA is not required to comply with the plans that it submits to and has had approved by the City Council, we would render the City Council approval requirement in the enabling resolution meaningless.

Moreover, the EDA controlled the creation of the Redevelopment Plan and adopted the Plan. In an EDA resolution

passed on August 7, 2001, the EDA stated that it "investigated the facts relating to the [Redevelopment Plan] and has caused the Plan[ ] to be prepared" and that it adopted the Redevelopment Plan. The EDA is bound by the resolutions it and the City Council pass. *Cf. Mayes v. Byers*, 214 Minn. 54, 63, 7 N.W.2d 403, 407 (1943) ("A city ordinance within its proper scope has the force and effect of law."). We therefore conclude that Resolution 01–63 and the Redevelopment Plan adopted by that Resolution are binding on the EDA.

### E. Does the Redevelopment Plan Prohibit the EDA from Condemning the Property Owners' Property?

We next consider the content of Resolution 01–63—specifically, the provisions of the Redevelopment Plan and TIF Plan—to determine what limitations were placed on the EDA's authority to acquire property. As we begin our analysis of the Redevelopment Plan and the TIF Plan, we note that the Plans are poorly drafted. In particular, the imprecise language of the Redevelopment Plan, especially the language of Subsection 1–8, makes interpretation of Subsection 1–8 challenging.

The challenge we face here brings to mind the frustration expressed by one of the most esteemed jurists ever to sit on this court—Justice William Mitchell—in an opinion written over 125 years ago. Justice Mitchell and the court on which he sat faced the challenge of dealing with a statute that contained "very imperfect" and "very obscure" provisions. *See Pamperin v. Scanlan*, 28 Minn. 345, 347, 9 N.W. 868, 869 (1881). Justice Mitchell, when presented with the challenge of interpreting this poorly drafted statute regulating the redemption of mortgages premises after foreclosure, said:

> The provisions of this statute are so very imperfect and in some respects so very obscure, that the task of construing them is one of great difficulty. Indeed, we do not think it possible to place a construction upon some of the provisions of this statute that will not be subject to grave objections and result in some serious practical difficulties. When called upon to construe so imperfect a statute, the best course for a court to pursue is to consider its general aim or purpose, and the plan adopted to carry that purpose into effect, and then adopt the construction that will in practice most nearly accomplish the object intended.

*Id.* at 347–48, 9 N.W. at 869. In the case before us, we will heed the advice of Justice Mitchell when faced with the difficult task of interpreting an imperfectly drafted resolution. We will sort through Resolution 01–63's language and pursue the "best course" available which is to consider its "general aim or purpose" and adopt a "construction that will in practice most nearly accomplish the object intended." *See id.* at 348, 9 N.W. at 869.

Subsection 1–8 of the Redevelopment Plan, which was incorporated into Resolution 01–63, is titled "Proposed Reuse of Property," and states in full:

> The Redevelopment Plan contemplates that the City may acquire property and reconvey the same to another entity. Prior to formal consideration of the acquisition of any property, the City will require the execution of a binding development agreement with respect thereto and evidence that Tax Increments or other funds will be available to repay the Public Costs associated with the proposed acquisition. It is the intent of the City to negotiate the acquisition of property whenever possible. Appropriate restrictions regarding the reuse and redevelopment of property shall be incorporated into any development agreement to which the City is a party.

The parties disagree as to which entities Subsection 1–8 applies and as to what type of transaction it restricts. The property owners argue that Subsection 1–8 applies to the EDA even though the subsection does not explicitly name the EDA. Additionally, they argue that Subsection 1–8 requires a binding development agreement before the EDA considers acquiring any property for any reason. The EDA responds to this argument by asserting that Subsection 1–8 limits only the City's power to acquire property, not the EDA's power to acquire property. Alternatively, the EDA argues that Subsection 1–8 does not limit the City's or the EDA's powers to acquire property in furtherance of the Redevelopment Project, except in instances of "reuse" of property. In this alternative argument, the EDA asserts that when Subsection 1–8 is read in light of other provisions of the Redevelopment Plan and the TIF Plan, it plainly applies only to instances where a developer "has taken the lead in acquiring property," and the EDA acquires the property with intent to convey the property to that specific developer.

 Whenever possible, a statute should be interpreted to give effect to all of its provisions. *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn. 2000) ("[N]o word, phrase, or sentence should be deemed superfluous, void, or insignificant." (citation omitted) (internal quotation marks omitted)). We must "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Id.* We have also said that "courts should construe a statute to avoid absurd results." *Id.* at 278. Rules of statutory construction are applicable to the construction of municipal ordinances and resolutions. *E.g., Smith v. Barry,* 219 Minn. 182, 187, 17 N.W.2d 324, 327 (1944).

### 1. Meaning of the Word "City"

 The first question we must address with respect to Subsection 1–8 is whether the word "City," as used in the Redevelopment Plan, is distinct from the EDA or includes the EDA. Our attempt to define the word "City" as used in the Redevelopment Plan will illustrate the problems created by the poor drafting of the Plan. The EDA points out that "City" is defined in the Redevelopment Plan to mean "the City of Eagan," and argues that the word "City" does not include the EDA because an economic development authority is a political subdivision of the state and is a separate entity from a city or a city council. *See* Minn.Stat. § 469.091, subd. 2.

We acknowledge that the EDA is a political subdivision of the state with the right to sue and be sued in its own name. *See* Minn.Stat. § 469.091, subd. 2. ("An economic development authority is a public body corporate and politic and a political subdivision of the state with the right to sue and be sued in its own name."). But the usage of the word "City" in the Redevelopment Plan is inconsistent because it appears the word sometimes means the City alone and other times includes the City Council and the EDA, the entities that act on its behalf. In several provisions of the Redevelopment Plan, interpreting the word "City" to include the EDA is necessary for the Redevelopment Plan to make sense. In Subsection 1–2, for example, the Redevelopment Plan provides that "[t]he Enabling Act authorizes the City, upon certain public purpose findings by the City, to establish and designate development and redevelopment projects." The "Enabling Act" is specifically defined in Subsection 1–1 of the Redevelopment Plan as Minn.Stat. §§ 469.090–.1081 and 469.001–.047. These statutory sections apply to economic development authorities

and housing and redevelopment authorities; they authorize an *economic development authority* to establish and designate redevelopment projects. *See* Minn.Stat. §§ 469.027, 469.101. Accordingly, it appears that Subsection 1–2 makes sense only if we read "City" as including the EDA. In another instance directly relevant to the issue in this case, Subsection 1–8 appears to make more sense if the word "City" includes the EDA. Subsection 1–8 states that "[t]he Redevelopment Plan contemplates that the City may acquire property and reconvey the same." The City acts through entities like the EDA and City Council and can acquire property only through such entities. If the word "City" as used in the Redevelopment Plan does not refer to the entities that act for the City, the directions and restrictions in the Redevelopment Plan would have little significance as they would not instruct or restrict the actions of any entity.

We also see little merit in the EDA's argument that Subdivision 1–8 intentionally names only the "City" because the drafters intended to limit the City Council's actions made on the City's behalf but not the EDA's actions. The drafters differentiated between the City Council and the City in the Redevelopment Plan.[5] While EDA is not mentioned in the definitions subsection of the Redevelopment Plan, "City Council" is defined as "the City Council of the City of Eagan." And, while the other subsections of the Plan do not mention the EDA, Subdivision 1–10 does refer to the City Council. We conclude that if the drafters wanted to limit the City Council's actions but not the EDA's, it could and would have used the words "City Council." Moreover, the EDA has not offered any reasonable rationale for why the drafters would impose the limitation in Subsection 1–8 on the City Council but not the EDA.

Additionally, the lack of any consistent reference to the EDA in the Redevelopment Plan supports the conclusion that the word "City," as used in the Plan, includes the EDA. The EDA is not defined in the definition subsection of the Redevelopment Plan, nor is it mentioned in other subsections of the Plan. The sole reference in the Redevelopment Plan to the EDA occurs in the definition of "Tax Increment Bonds" which states "any tax increment bonds or notes issued by the *EDA or the City* to finance the Public Costs." (Emphasis added.) The use of the phrase "the EDA or the City" suggests the drafters knew how to differentiate between the two terms, a suggestion that supports the EDA's argument that the word "City" as used in the Redevelopment Plan is distinct from the EDA. But this is the sole reference to the EDA in the entire Redevelopment Plan. While we conclude that the single reference carries some weight, it does not justify a narrow interpretation of the term "City."

In contrast, the EDA is mentioned throughout the TIF Plan, which is a separate document adopted by Resolution 01–63—the same Resolution that adopted the Redevelopment Plan. The TIF Plan consistently uses the phrases "the EDA and City" or "the EDA or City." Given that the Redevelopment Plan and TIF Plan were prepared by the same entity and adopted by both the EDA and the City, the fact that "the EDA and City" language is used in the TIF Plan could be construed to indicate that the drafters of the two documents knew how to differentiate between the two entities. But, on the other hand, the fact that the two entities are always mentioned together, as if one unit, could suggest that the drafters thought of

---

5. In contrast, the TIF Plan does not refer to the City Council.

the two entities essentially as one unit and meant to limit them both. Here, we find the lack of mention of the EDA in the Redevelopment Plan to be puzzling given the EDA's participation in establishing the Cedar Grove Redevelopment Area and the consistent reference to the EDA in the TIF Plan. Without a doubt the language is imprecise, but the best course for us to pursue is to conclude that the lack of reference to the EDA in the Redevelopment Plan, coupled with the fact that the EDA has a central role to play in the Cedar Grove Redevelopment Project, most likely suggests that the drafters of the Plan intended the word "City" to encompass the EDA. In fact, to conclude otherwise would render the Redevelopment Plan nearly incomprehensible. Therefore, we conclude that the word "City" in Subsection 1–8 refers to the EDA and applies to the EDA's actions.

*2. Scope of Subsection 1–8*

■ Having concluded that the word "City" as used in the Redevelopment Plan includes the EDA and having previously concluded that the Redevelopment Plan is binding on the EDA, we must now determine precisely to what type of transaction Subsection 1–8 refers in order to determine whether the EDA exceeded its authority in condemning the property owners' property. The EDA argues that Subsection 1–8 applies when the EDA acquires property with the intent to convey the property to a specific developer. The property owners assert that Subsection 1–8 requires the EDA to secure a binding development agreement before it considers acquiring any property for any reason.

When read in isolation, the second sentence of Subsection 1–8—"[p]rior to formal consideration of the acquisition of any property, the City will require the execu-

tion of a binding development agreement with respect thereto"—appears to prohibit formal consideration of acquisition of property by any manner unless there is a binding development agreement in place. This is the interpretation offered by the property owners. But we may not read the second sentence in isolation. Rules of construction require that we read and construe Subsection 1–8 as a whole and interpret it in light of surrounding sections to avoid conflicting interpretations. *Cf. Schroedl*, 616 N.W.2d at 277. We must therefore consider the other sentences of Subdivision 1–8 and other provisions of the Redevelopment Plan to ascertain the intent of the drafters. Because the TIF Plan was adopted contemporaneously with the Redevelopment Plan by the City Council in a single resolution and both Plans address the Cedar Grove Redevelopment Project, we will consider provisions of the TIF Plan as well.

Reading Subsection 1–8 as a whole demonstrates that the binding development agreement requirement does not apply to all instances of property acquisition. The subsection is titled "Proposed Reuse of Property." The first sentence of Subsection 1–8 states, "The Redevelopment Plan contemplates that the City may acquire property and reconvey the same to another entity." The requirement that a binding development agreement exist "[p]rior to formal consideration of the acquisition of any property" refers to the type of property acquisition included in the previous sentence—property that is acquired so that it can be reconveyed to another entity. *Cf.* Minn.Stat. § 645.08 (2008) ("[G]eneral words are construed to be restricted in their meaning by preceding particular words.").

Subsection 1–12 of the Redevelopment Plan, titled "Property Acquisition," states that the City may acquire property "as the

City may deem to be necessary or desirable to assist in the implementation of the Redevelopment Plan." No binding development requirement is included in Subsection 1–12, further demonstrating that the drafters did not intend the binding development requirement to apply to property acquisition generally. If the drafters intended the restriction to apply to property acquisition generally, they could have placed the restriction in Subsection 1–12.[6]

We further conclude that Subsection 1–8's application is limited to instances where the EDA acquires property with the intent to convey the property to a specific developer, rather than with the general intent to convey the property to an unknown developer sometime in the future. We reach this conclusion because interpreting Subsection 1–8 to apply to instances where the EDA acquires property with the general intent to eventually convey the property to a developer that is unknown to the EDA at the time of the acquisition would render Subsection 2–4(3) and 2–22 of the TIF Plan meaningless.

Subsection 2–4(3) of the TIF Plan provides that "[u]pon approval of a developer's plan relating to the project and completion of the necessary legal requirements, the EDA or City may sell to a developer selected properties that they may acquire." If Subsection 1–8 requires the EDA to have a binding development agreement before it acquires property, such a requirement would likely ensure that the EDA approves a developer's plan before it acquired the property. If this were so, Subsection 2–4(3)'s requirement that the EDA approve the developer's plan before it sells the property to that developer would be meaningless.

Subsection 2–22 of the TIF Plan states that "no more than 25 percent, by acreage, of the property to be acquired in the District as set forth in the Plan shall at any time be owned by the EDA or City as a result of acquisition with the proceeds of bonds ... unless prior to acquisition in excess of 25 percent of the acreage, the EDA or City concluded an agreement for the development or redevelopment of the property acquired." If Subsection 1–8 requires the EDA to have a binding development agreement before it acquires any property it intends to eventually convey to a developer unknown at the time of the acquisition, Subsection 2–22's requirement that the EDA "conclude[ ] an agreement" for property it acquired by bonds in excess of 25 percent of the TIF District would be meaningless. Under such an interpretation of Subsection 1–8, the EDA would be required to have a development agreement for essentially all of the property it acquires, rather than just the property in excess of 25 percent of the TIF District acquired by bonds, and the restriction in Subsection 2–22 would be unnecessary.[7]

---

**6.** Other provisions of the TIF Plan also support our conclusion that the binding development agreement requirement does not apply to all instances of property acquisition. The TIF Plan acknowledges that "[c]ontracts for [redevelopment] have not been entered into at the time of preparation of this Plan." Nevertheless, Subsection 2–5 of the TIF Plan specifically lists the parcels that are within the TIF District and then states, "The EDA or City may acquire any parcel within the District." Subsection 2–5 does not state that the EDA or City need a binding development agreement before they can acquire property. Similarly, Subsection 2–4 of the TIF Plan provides that "[s]elected property located within the District may be acquired by the EDA or City" and does not include a binding development agreement requirement.

**7.** Additionally, the EDA's and City Council's actions suggest they intended a more limited application of the binding development agreement requirement. The EDA hired consultants to prepare the Redevelopment and TIF Plans for it and therefore essentially drafted

When we read and construe Subsection 1–8 as a whole, interpret Subsection 1–8 in light of other subsections of the Redevelopment and TIF Plans, and give effect to all of the subsections, the property owners' claim that Subsection 1–8 requires the EDA to have a binding development agreement before it acquires property for any reason fails. *See Schroedl*, 616 N.W.2d at 277. Instead, it appears that the drafters intended the binding development agreement requirement to apply in limited situations: when the EDA acquires property with the intent to convey the property to a known developer. Here, it is undisputed that the EDA is not acquiring property owners' property at the behest of a developer. Though the record suggests that the EDA sought to acquire the property owners' property with the intent that it will eventually convey the property to a developer, it did not acquire the property with the intent to convey it to a known developer. Thus, Subsection 1–8 does not require the EDA to have a binding development agreement with a third party before it acquires the property owners' property. Accordingly, we conclude that the EDA did not exceed the scope of its authority when it acquired the property owners' property. We therefore hold that the district court's conclusion that the EDA complied with Resolution 01–63 and the Redevelopment Plan the Resolution incorporates was not erroneous.

At this point, one further comment is necessary. In reaching our holding, we do not mean to endorse universally an interpretation of Subsection 1–8 either as a matter of drafting or substantive policy. Our task was to interpret Resolution 01–63 and the Plans it incorporated and to give some rational meaning to all the provisions of the Redevelopment and TIF Plans, a difficult and challenging task given that Subsection 1–8 was imperfectly drafted. We also note that the EDA was responsible for drafting the Plans—according to the EDA's August 7, 2001 resolution, the EDA "caused the [Redevelopment and TIF] Plans to be prepared." Without question, the EDA could have used greater care in drafting the Plans to explain more clearly the limitations it intended to place on its ability to acquire property. Nevertheless, we conclude that Subsection 1–8 of the Redevelopment Plan as drafted does not require a binding development agreement before the EDA acquires property in this instance.

Finally, the property owners challenged the district court's quick-take order on other grounds. Because the court of appeals invalidated the quick-take order on the ground that the EDA exceeded the scope of its eminent domain authority, it did not address the property owners' other claims that the taking was not necessary for public use and that the EDA was not entitled to use quick-take procedures. Therefore, we reverse and remand to the court of appeals to consider the property owners' other claims.

Reversed and remanded.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

the Plans. After the Plans were approved, the EDA acquired 93 percent of the property in the core area of the Cedar Grove Redevelopment Area without a binding development agreement and the City Council funded those acquisitions. The drafters' own behavior suggests they did not intend to limit their ability to acquire property in all instances. The EDA's and the City Council's subsequent actions are consistent with the more narrow interpretation of Subsection 1–8.