*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-1380**

Peter K Butler,
Appellant,

vs.

City of St. Paul, Minnesota,
Respondent.

**Filed March 23, 2026**
**Reversed and remanded**
**Worke, Judge**

Ramsey County District Court
File No. 62-CV-24-5226

Peter K. Butler, St. Paul, Minnesota (pro se appellant)

Irene Kao, St. Paul City Attorney, Curtis Grayer III, Assistant City Attorney, St. Paul, Minnesota (for respondent)

Considered and decided by Worke, Presiding Judge; Ross, Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**WORKE**, Judge

Appellant challenges the district court's grant of summary judgment in favor of respondent-city on appellant's claim that the city unlawfully disbursed public funds to city projects that were not specifically included in the city's resolution regarding entitlement to the funds. We reverse and remand.

**FACTS**

To provide context for the facts, we begin with an overview of the governing statutory scheme. The legislature allows municipalities to impose a general sales tax through special law, provided that (1) the municipality adopts a resolution indicating its approval of the tax and submits that approved resolution to the legislature, (2) the legislature grants conditional authority to impose the tax, and (3) the city obtains residential authority to impose the sales tax and use the revenue for the projects through an election vote. Minn. Stat. § 297A.99, subds. 1-3 (2024). Minnesota Statutes require that the city's resolution include several specific elements before it can be submitted to the legislature for conditional authority. The resolution must include:

> (1) the proposed tax rate;
> (2) a detailed description of no more than five capital projects that will be funded with revenue from the tax;
> (3) documentation of the regional significance of each project, including the share of the economic benefit to or use of each project by persons residing, or businesses located, outside of the jurisdiction;
> (4) the amount of local sales tax revenue that would be used for each project and the estimated time needed to raise that amount of revenue; and
> (5) the total revenue that will be raised for all projects before the tax expires, and the estimated length of time that the tax will be in effect if all proposed projects are funded.

Minn. Stat. § 297A.99, subd. 2(a). The special legislation granting authority to impose a local sales tax "must not include any projects not contained in the resolution." Minn. Stat. § 297A.99, subd. 2(c). The statute defines "project" or "capital project" as "(1) a single building or structure including associated infrastructure needed to safely access or use the

2

building or structure; (2) improvements within a single park or named recreation area; or (3) a contiguous trail." Minn. Stat. § 297A.99, subd. 2(d).

In January 2023, respondent City of St. Paul, Minnesota (the city) adopted Resolution 23-33 (RES 23-33), indicating its approval of a one-percent sales tax for 20 years to fund "[r]ebuilding and improving regionally significant transportation infrastructure," and "[r]ebuilding and [i]mproving regionally significant parks and recreational infrastructure." The resolution indicated that the specific investments of both projects would be listed in "Attachment A." Attachment A to the resolution listed 25 roads as "specific investments" under the "[r]ebuilding and improving regionally significant roads and trails" project. Under the "[r]ebuilding and improving regionally significant park and recreational infrastructure" project, Attachment A indicated the following specific investments:

> **Revitalize Existing Facilities:** . . .
> **Mississippi River Learning Center:** . . .
> **Multipurpose East Side Community Center:** . . .
> **Mississippi River Balcony:** . . .
> **Multipurpose Athletic Complex:** A versatile, dedicated multi-sport/multi-use regional athletic complex that would serve Saint Paul[,] along with visitors from the metro area and the entire state. This 21st[-]century facility would provide the ability to host sporting events and other large-scale programs and activities.
> **Downtown Park Improvements**: Park improvements and revitalization for several downtown parks[,] including Pedro Park, Lower Landing Park, and Kellogg Mall Park, Mears Park, Harriet Island, and Wacouta Commons. . . . .
> **Bruce Vento Bridge:** . . .

The city submitted RES 23-33 to the Minnesota Legislature seeking conditional authority to impose the tax for the described projects. In a 2023 session law, the legislature

3

granted the city the authority to impose "a sales and use tax of one percent for the [improvements] specified in subdivision 2b." 2023 Minn. Laws ch. 64, art. 10, § 2, subd. 1a, at 3116. The legislature also removed specific statutory requirements governing the use of the tax revenue on those listed improvements. *See id.* § 2, subd. 2b(a), at 3117. The legislature also required the city to amend its resolution to include bridges within the authorized use of revenues. *Id.* § 2, subd. 2b(b), at 3117.

The city made the requisite amendment to include bridges as an authorized use of the tax revenue through subsequent resolution. The city's voters approved the sales tax, and the city adopted an ordinance imposing the tax.

In February 2024, the city adopted Resolution Public Hearing 24-3, which earmarked the sales-tax revenue to, among other things, "the [Heights][1] development" (the Heights) and a multi-use athletic field at Victoria Park (Victoria Park). Appellant Peter K. Butler filed suit against the city, claiming it was unlawfully disbursing public funds to the Heights and Victoria Park. The city moved for summary judgment. The district court granted summary judgment, concluding that the legislature's elimination of specific statutory requirements created a broad view of what improvements the city could utilize the revenue for. The district court concluded that, based on this broad view, there was no genuine issue of material fact and "the [d]efendant is entitled to judgment as a matter of law." This appeal followed.

---

[1] The resolution originally stated, "the Hillcrest development." The name of the development changed to "Heights" after the resolution was adopted.

**DECISION**

Butler challenges the district court's grant of summary judgment, arguing it erred in its interpretation of the session law. "On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law." *Hayden v. City of Minneapolis*, 937 N.W.2d 790, 795 (Minn. App. 2020) (quotation omitted), *rev. denied* (Minn. Apr. 14, 2020). Based on the record and briefs, the dispute is based solely on the interpretation and application of the session law, not on any material facts. We review a grant of summary judgment based solely on the application of a statute de novo. *Id.* We also review interpretations of statutes and municipal resolutions de novo. *Eagan Econ. Dev. Auth. v. U-Haul Co.*, 787 N.W.2d 523, 529 (Minn. 2010).

We interpret statutes to ascertain and effectuate legislative intent. *Hayden*, 937 N.W.2d at 795. To do so, we first look at whether the statute's language is ambiguous, and if not, apply its plain language. *Id.* In interpreting a statute, "no word, phrase, or sentence should be deemed superfluous, void, or insignificant," and we "cannot add to a statute what the legislature has either purposely omitted or inadvertently overlooked." *Id.* at 795-96 (quotations omitted). If the statute is unambiguous, we will not "disregard the letter of the law in pursuit of its purpose." *Id.* at 795 (quotation omitted). In rare cases where the statute's literal meaning "utterly confounds" clear legislative purpose, we may "examine other indicia of legislative intent." *Id.* at 795-96 (quotations omitted).

We also recognize that municipalities are creatures of the state and possess no powers other than those conferred by statute or that are necessarily implied to carry out

5

express powers. *Breza v. City of Minnetrista*, 725 N.W.2d 106, 110 (Minn. 2006) (citing Minn. Const. art. XII, § 3). Thus, cities have no inherent power beyond that allowed by state law. *See id.*

The city asserts that, once the legislature approves the sales tax, it can dictate or change what projects the revenue can be used for, so long as the project serves a public purpose. The city appears to conflate the public-purpose requirement for spending tax revenue with the requirement for legislative authorization.

The use of public funds is lawful if it is spent for a public purpose, authority has been given allowing the expenditure, and the use is genuine. *See Clapp v. Sayles-Adams*, 15 N.W.3d 648, 652 (Minn. 2025); *Tousley v. Leach*, 230 N.W. 788, 789 (Minn. 1930). A municipality may impose a local sales tax only if the law already grants it the authority, or it seeks approval from the legislature. *See* Minn. Stat. § 297A.99, subd. 1(a). If the city seeks approval from the legislature, it must adopt a resolution indicating approval of the tax, with the inclusion of several specific statutorily listed requirements, and submit the resolution to the legislature. Minn. Stat. § 297A.99, subd. 2(a)-(b). And the statute states that the legislature cannot approve "any projects not contained in the resolution." Minn. Stat. § 297A.99, subd. 2(c).

Permitting postapproval changes would render the statute's resolution and submission requirements meaningless, and provide a municipality—a creature of the state—authority that the legislature does not have: the power to modify projects after the

6

fact.[2] Thus, the city cannot spend local sales tax revenue on a project, even if it is for a public purpose, unless the legislature has authorized the expenditure of the funds on that specific project.

In the session law authorizing the local sales tax, the legislature stated that the associated revenue may be used for improvements to streets and bridges "notwithstanding Minnesota Statutes, section 297A.99, subdivision 2, paragraphs (a), clause (2), and (d)," and capital improvements to the city's parks and recreation facilities "notwithstanding Minnesota Statutes, section 297A.99, subdivision 2, paragraph (d)." 2023 Minn. Laws ch. 64, art. 10, § 2, subd. 2b(a), at 3117. Minnesota Statutes, section 297A.99, subdivision 2(d) establishes the definition of "capital project" and "project" as: "(1) a single building or structure including associated infrastructure needed to safely access or use the building or structure; (2) improvements within a single park or named recreation area; or (3) a contiguous trail." Minnesota Statutes, section 297A.99, subdivision 2, paragraph (a)(2) states that the resolution the municipality submits to the legislature must include "a detailed description of no more than five capital projects that will be funded with revenue from the tax." Thus, the session law omits the statutory definition of "capital project" from both project categories, but the requirement limiting the resolution to "no more than five capital projects" is omitted only from the project to improve the streets and bridges. This distinction assists us with our legislative interpretation. *See White Bear Lake Restoration*

---

[2] Additionally, Minnesota law allows a first-class city to use excess local-sales-tax revenue for other regionally significant capital projects. Minn. Stat. § 297A.9905 (2024). The legislature would not have created this excess-revenue exception if cities had unrestricted authority to redirect revenues to any public-purpose project.

*Ass'n ex rel. State v. Dep't of Nat. Res.*, 946 N.W.2d 373, 383 (Minn. 2020) ("A statute should be interpreted to give effect to all of its provisions[,] . . . to be read and construed as a whole, and each section must be interpreted in light of the surrounding sections to avoid conflicting interpretations.").

Attachment A to the city's resolution for improvements to streets and bridges, RES 23-33, lists 25 streets and one bridge to improve. Streets and bridges are not included within the statutory definition of capital projects. *See* Minn. Stat. § 297A.99, subd. 2(d). The 25 streets and one bridge listed are also beyond the statutory limitation of listing "no more than five capital projects" within the submitted resolution. Thus, the legislature needed to remove both the "capital projects" definition and the limitation of "no more than five capital projects" for the city to use the revenue on the streets and bridge listed in Attachment A.

Attachment A of RES 23-33 also lists five parks to be improved: "Pedro Park, Lower Landing Park, and Kellogg Mall Park, Mears Park, Harriet Island, and Wacouta Commons." While Attachment A appears to list six parks, the first coordinating conjunction "and" between Kellogg Mall Park and Lower Landing Park combines the two parks into one project, while the second "and" in the list indicates the end of the list. This explains why the legislature did not remove the five-project-maximum requirement from the improvements to the parks and recreational facilities. Further support for this conclusion includes the fact that (1) Lower Landing Park and Kellogg Mall Park are geographically near each other, and (2) while the legislature did not remove the five-project-maximum requirement, it did remove the statutory definition of "capital projects,"

8

which limited a project to a "*single* park or named recreational area," Minn. Stat. § 297A.99, subd. 2(d) (emphasis added), which ensured that the Landing Park and Kellogg Mall Park project would be seen as one project, not two. Thus, once the legislature removed the statutory definition of "capital projects," it created only five projects, and there was no need to remove the five-project-maximum requirement.

The legislature's elimination of the statutory definition and five-project-maximum requirement from the streets and bridge improvements, but only the statutory definition from the park improvements, shows that the legislature saw Attachment A as a final list of the city's intended improvements. This conclusion is further supported by the legislature's requirement that the city adopt an amended resolution authorizing the use of tax revenues for "bridges" within the body of the resolution. This requirement indicates that the legislature took notice of the bridge improvement identified in Attachment A, noticed it was pigeonholed under park improvements, and wanted to ensure (1) the voters knew that bridges were an intended improvement for which the revenue would be used, and (2) the city did not try to hide the bridge improvement within the parks category.[3]

In total, the session law shows that the legislature viewed Attachment A as the comprehensive list of intended projects for which the revenue would be used. As such, the

---

[3] The argument may be raised that if Attachment A were part of the resolution, then there would be no need to amend. The main text of RES 23-33 does not discuss bridges specifically, but improvements to the Bruce Vento Bridge appear in Attachment A. This created a discrepancy between the body of the resolution and Attachment A. To ensure the revenue was to be used on the bridge, the legislature told the city to adopt an amended resolution so that the resolution reflected the specific investments listed in Attachment A. In other words, the legislature saw the main text and Attachment A as one piece, and wanted to ensure the main text mirrored the investment listed in Attachment A.

district court erred by granting summary judgment under the conclusion that the session law broadened the scope of the projects on which the city could use the revenue to include parks that were not listed within Attachment A.  We reverse the grant of summary judgment to the city and remand for further proceedings.

**Reversed and remanded.**